**Karen Frances ULANE,**
**Plaintiff-Appellee,**

v.

**EASTERN AIRLINES, INC., a Delaware corporation, Defendant-Appellant.**

**No. 84–1431.**

United States Court of Appeals,
Seventh Circuit.

Argued June 5, 1984.

Decided Aug. 29, 1984.

Rehearing and Rehearing In Banc
Denied Nov. 16, 1984.

Dean A. Dickie, Sachnoff, Weaver & Rubenstein, Ltd., Chicago, Ill., for plaintiff-appellee.

David M. Brown, Gambrell & Russell, Atlanta, Ga., for defendant-appellant.

Before CUMMINGS, Chief Judge, WOOD, Circuit Judge, and DUMBAULD, Senior District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

Plaintiff, as Kenneth Ulane, was hired in 1968 as a pilot for defendant, Eastern Air Lines, Inc., but was fired as Karen Frances Ulane in 1981. Ulane filed a timely charge of sex discrimination with the Equal Employment Opportunity Commission, which subsequently issued a right to sue letter. This suit followed. Counts I and II allege that Ulane's discharge violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e—2000e–17 (1982): Count I alleges that Ulane was discriminated against as a female; Count II alleges that Ulane was discriminated against as a transsexual. The judge ruled in favor of Ulane on both counts after a bench trial.[1] 581 F.Supp. 821. The court awarded her[2] reinstatement as a flying officer with full seniority and back pay, and attorneys' fees. This certified appeal followed pursuant to Federal Rule of Civil Procedure 54(b).

## FACTUAL BACKGROUND

Counsel for Ulane opens their brief by explaining: "This is a Title VII case brought by a pilot who was fired by Eastern Airlines for no reason other than the fact that she ceased being a male and became a female." That explanation may give some cause to pause, but this briefly is the story.

Ulane became a licensed pilot in 1964, serving in the United States Army from that time until 1968 with a record of combat missions in Vietnam for which Ulane received the Air Medal with eight clusters. Upon discharge in 1968, Ulane began flying for Eastern. With Eastern, Ulane progressed from Second to First Officer, and

---

\* The Honorable Edward Dumbauld, Senior District Judge of the United States District Court for the Western District of Pennsylvania, is sitting by designation.

1. Counts III through IX, which allege violations of 42 U.S.C. §§ 1985(3), 1986, 18 U.S.C. § 371 (conspiracy), and 45 U.S.C. § 184 (Railway La-

bor Act), defamation, and intentional or reckless causing of emotional and mental distress, have not yet been tried.

2. Since Ulane considers herself to be female, and appears in public as female, we will use feminine pronouns in referring to her.

also served as a flight instructor, logging over 8,000 flight hours.

Ulane was diagnosed a transsexual [3] in 1979. She explains that although embodied as a male, from early childhood she felt like a female. Ulane first sought psychiatric and medical assistance in 1968 while in the military. Later, Ulane began taking female hormones as part of her treatment, and eventually developed breasts from the hormones. In 1980, she underwent "sex reassignment surgery." [4] After the surgery, Illinois issued a revised birth certificate indicating Ulane was female, and the FAA certified her for flight status as a female. Ulane's own physician explained, however, that the operation would not create a biological female in the sense that Ulane would "have a uterus and ovaries and be able to bear babies." Ulane's chromosomes, [5] all concede, are unaffected by the hormones and surgery. Ulane, however, claims that the lack of change in her chromosomes is irrelevant. [6] Eastern was not aware of Ulane's transsexuality, her hormone treatments, or her psychiatric counseling until she attempted to return to work after her reassignment surgery. Eastern knew Ulane only as one of its male pilots.

**3.** Transsexualism is a condition that exists when a physiologically normal person (*i.e.*, not a hermaphrodite—a person whose sex is not clearly defined due to a congenital condition) experiences discomfort or discontent about nature's choice of his or her particular sex and prefers to be the other sex. This discomfort is generally accompanied by a desire to utilize hormonal, surgical, and civil procedures to allow the individual to live in his or her preferred sex role. The diagnosis is appropriate only if the discomfort has been continuous for at least two years, and is not due to another mental disorder, such as schizophrenia. *See* Testimony of Dr. Richard Green, expert witness for plaintiff, trial transcript for Sept. 26, 1983, 10:00 a.m., at 35–37; *see generally* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* § 302.5x (3d ed. 1980); Edgerton, Langman, Schmidt & Sheppe, *Psychological Considerations of Gender Reassignment Surgery*, 9 Clinics in Plastic Surgery 355, 357 (1982); Comment, *The Law and Transsexualism: A Faltering Response to a Conceptual Dilemma*, 7 Conn.L.Rev. 288, 288 n. 1 (1975); Comment, *Transsexualism, Sex Reassignment Surgery, and the Law*, 56 Cornell L.Rev. 963, 963 n. 1 (1971).

To be distinguished are homosexuals, who are sexually attracted to persons of the same sex, and transvestites, who are generally male heterosexuals who cross-dress, *i.e.*, dress as females, for sexual arousal rather than social comfort; both homosexuals and transvestites are content with the sex into which they were born. *See Diagnostic and Statistical Manual of Mental Disorders* § 302.30; Wise & Meyer, *Transvestism: Previous Findings and New Areas for Inquiry*, 6 J. of Sex & Marital Therapy 116, 116–20 (1980); Comment, 7 Conn.L.Rev., *supra*, at 292; Comment, 56 Cornell L.Rev., *supra*, at 963 n. 3.

**4.** Sex reassignment surgery for male-to-female transsexuals "involves the removal of the external male sexual organs and the construction of an artificial vagina by plastic surgery. It is supplemented by hormone treatments that facilitate the change in secondary sex characteristics," such as breast development. Comment, 56 Cornell L.Rev., *supra* note 3, at 970 n. 37 (citations omitted); *see also* Jones, *Operative Treatment of the Male Transsexual*, in Transsexualism and Sex Reassignment 313, 314–16 (R. Green & J. Money eds. 1969); Stoller, *Near Miss: "Sex Change" Treatment and Its Evaluation*, in Eating, Sleeping, and Sexuality 258, 259 (M. Zales ed. 1982); Shaw, *Sex-change Capital: Surgeon is Town's Top Draw*, Chicago Tribune, Aug. 14, 1984, § 5, at 1, 3, col. 3.

**5.** The normal individual has 46 chromosomes, two of which designate sex. An XX configuration denotes female; XY denotes male. These chromosome patterns cannot be surgically altered. Wise, *Transsexualism: A Clinical Approach to Gender Dysphoria*, 1983 Medic.Trial Tech.Q. 167, 170.

**6.** Biologically, sex is defined by chromosomes, internal and external genitalia, hormones, and gonads. Wise, *supra* note 5, at 169. Chromosomal sex cannot be changed, and a uterus and ovaries cannot be constructed. This leads some in the medical profession to conclude that hormone treatments and sex reassignment surgery can alter the evident makeup of an individual, but cannot change the individual's innate sex. *See, e.g.*, Wise, *supra* note 5, at 170; Stoller, *supra* note 4, at 273; Comment, Cornell L.Rev., *supra* note 3, at 970 n. 37. Others disagree, arguing that one must look beyond chromosomes when determining an individual's sex and consider factors such as psychological sex or assumed sex role. Comment, 7 Conn.L.Rev., *supra* note 3, at 290–91 & n. 6, 292 (psychological sex may be most important factor); Comment, Cornell L.Rev., *supra* note 3, at 965. These individuals conclude that post-operative male-to-female transsexuals do in fact qualify as females and are not merely "facsimiles." *E.g.*, Testimony of Dr. Richard Green, expert witness for plaintiff, trial transcript for Sept. 27, 1983, 10:35 a.m., at 226 & 252.

## LEGAL ISSUES

### A. *Title VII and Ulane as a Transsexual.*

■ The district judge first found under Count II that Eastern discharged Ulane because she was a transsexual, and that Title VII prohibits discrimination on this basis.[7] While we do not condone discrimination in any form,[8] we are constrained to hold that Title VII does not protect transsexuals, and that the district court's order on this count therefore must be reversed for lack of jurisdiction.

Section 2000e-2(a)(1) provides in part that:

(a) It shall be an unlawful employment practice for an employer—

(1) to ... discharge any individual ... because of such individual's ... sex
....

Other courts have held that the term "sex" as used in the statute is not synonymous with "sexual preference." *See, e.g., Sommers v. Budget Marketing, Inc.,* 667 F.2d 748, 750 (8th Cir.1982) (per curiam); *De Santis v. Pacific Telephone & Telegraph Co.,* 608 F.2d 327, 329–30 (9th Cir.1979); *Smith v. Liberty Mutual Insurance Co.,* 569 F.2d 325, 326–27 (5th Cir.1978); *Holloway v. Arthur Andersen & Co.,* 566 F.2d 659, 662 (9th Cir.1977); *Voyles v. Ralph K. Davies Medical Center,* 403 F.Supp. 456, 457 (N.D.Cal.1975), *aff'd mem.,* 570 F.2d 354 (9th Cir.1978). The district court recognized this, and agreed that homosexuals and transvestites do not enjoy Title VII protection, but distinguished transsexuals as persons who, unlike homosexuals and transvestites, have sexual *identity* problems; the judge agreed that the term "sex" does not comprehend "sexual preference," but held that it does comprehend "sexual identity." The district judge based this holding on his finding that "sex is not a cut-and-dried matter of chromosomes," but is in part a psychological question—a question of self-perception; and in part a social matter—a question of how society perceives the individual.[9] The district judge further supported his broad view of Title VII's coverage by recognizing Title VII as a remedial statute to be liberally construed. He concluded that it is reasonable to hold that the statutory word "sex" literally and scientifically applies to transsexuals even if it does not apply to homosexuals or transvestites.[10] We must disagree.

Even though Title VII is a remedial statute, and even though some may define "sex" in such a way as to mean an individual's "sexual identity," our responsibility is to interpret this congressional legislation and determine what Congress intended when it decided to outlaw discrimination based on sex. *See United States Department of Labor v. Forsyth Energy, Inc.,* 666 F.2d 1104, 1107 (7th Cir.1981). The district judge did recognize that Congress manifested an intention to exclude homosexuals from Title VII coverage. Nonetheless, the judge defended his conclusion that Ulane's broad interpretation of the term "sex" was reasonable and could therefore

---

7. Not all of the experts who testified agreed that Ulane is a transsexual. (Although doctors attempt to perform sex reassignment surgery only on transsexuals—as opposed, for example, on transvestites or schizophrenics, that an individual has undergone such surgery is not determinative of whether he or she is a true transsexual. *See supra* note 3 and sources cited therein.) If Ulane is not a transsexual, then she is a transvestite. Even in the trial judge's view, transvestites are not covered by Title VII.

8. Eastern presented a substantial amount of testimony and evidence at trial to prove that Ulane's discharge was not due to discrimination against her either as a transsexual or as a female, but we need not reach that issue.

9. The judge did recognize that there may be some argument in the medical community about the definition of sex that he adopted. *See, e.g., supra* notes 5 & 6.

10. Judge Grady explained:

I have no problem with the idea that the statute was not intended and cannot reasonably be argued to have been intended to cover the matter of sexual preference, the preference of a sexual partner, or the matter of sexual gratification from wearing the clothes of the opposite sex. It seems to me an altogether different question as to whether the matter of sexual identity is comprehended by the word, "sex."

be applied to the statute by noting that transsexuals are different than homosexuals, and that Congress never considered whether it should include or exclude transsexuals. While we recognize distinctions among homosexuals, transvestites, and transsexuals, we believe that the same reasons for holding that the first two groups do not enjoy Title VII coverage apply with equal force to deny protection for transsexuals.

■ It is a maxim of statutory construction that, unless otherwise defined, words should be given their ordinary, common meaning. *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979). The phrase in Title VII prohibiting discrimination based on sex, in its plain meaning, implies that it is unlawful to discriminate against women because they are women and against men because they are men. The words of Title VII do not outlaw discrimination against a person who has a sexual identity disorder, *i.e.,* a person born with a male body who believes himself to be female, or a person born with a female body who believes herself to be male; a prohibition against discrimination based on an individual's sex is not synonymous with a prohibition against discrimination based on an individual's sexual identity disorder or discontent with the sex into which they were born. The dearth of legislative history on section 2000e–2(a)(1) strongly reinforces the view that that section means nothing more than its plain language implies.

When Congress enacted the Civil Rights Act of 1964 it was primarily concerned with race discrimination. "Sex as a basis of discrimination was added as a floor amendment one day before the House approved Title VII, without prior hearing or debate." *Holloway v. Arthur Andersen & Co.,* 566 F.2d 659, 662 (9th Cir.1977) (citations omitted); *Developments in the Law—Employ-ment Discrimination and Title VII of the Civil Rights Act of 1964,* 84 Harv.L.Rev. 1109, 1167 (1971). This sex amendment was the gambit of a congressman seeking to scuttle adoption of the Civil Rights Act. The ploy failed and sex discrimination was abruptly added to the statute's prohibition against race discrimination. *See Bradford v. Peoples Natural Gas Co.,* 60 F.R.D. 432, 434–35 & n. 1 (W.D.Pa.1973).

The total lack of legislative history supporting the sex amendment coupled with the circumstances of the amendment's adoption clearly indicates that Congress never considered nor intended that this 1964 legislation apply to anything other than the traditional concept of sex. Had Congress intended more, surely the legislative history would have at least mentioned its intended broad coverage of homosexuals, transvestites, or transsexuals, and would no doubt have sparked an interesting debate. There is not the slightest suggestion in the legislative record to support an all-encompassing interpretation.

Members of Congress have, moreover, on a number of occasions, attempted to amend Title VII to prohibit discrimination based upon "affectational or sexual orientation." [11] Each of these attempts has failed. While the proposed amendments were directed toward homosexuals, *see, e.g., Civil Rights Act Amendments of 1981: Hearings on H.R. 1454 Before the Subcomm. on Employment Opportunities of the House Comm. on Education and Labor,* 97th Cong., 2d Sess. 1–2 (1982) (statements of Rep. Hawkins, chairman of subcommittee, and Rep. Weiss, N.Y., author of bill); *Civil Rights Amendments Act of 1979: Hearings on H.R. 2074 Before the Subcomm. on Employment Opportunities of the House Comm. on Education and Labor,* 96th Cong., 2d Sess. 6 (1980) (statements of Rep. Hawkins, chairman of subcommittee, and Rep. Weiss, N.Y., coauthor

11. *E.g., 94th Congress:* H.R. 166, 94th Cong., 1st Sess. (1975); H.R. 2667, 94th Cong., 1st Sess. (1975); H.R. 5452, 94th Cong., 1st Sess. (1975); *95th Congress:* H.R. 451, 95th Cong., 1st Sess. (1977); H.R. 775, 95th Cong., 1st Sess. (1977); H.R. 2998, 95th Cong., 1st Sess. (1977); H.R. 4794, 95th Cong., 1st Sess. (1977); H.R. 5239, 95th Cong., 1st Sess. (1977); H.R. 8268, 95th Cong., 1st Sess. (1977); H.R. 8269, 95th Cong., 1st Sess. (1977); *96th Congress:* H.R. 2074, 96th Cong., 2d Sess. (1980); *97th Congress:* H.R. 1454, 97th Cong., 2d Sess. (1982).

of bill), their rejection strongly indicates that the phrase in the Civil Rights Act prohibiting discrimination on the basis of sex should be given a narrow, traditional interpretation, which would also exclude transsexuals. Furthermore, Congress has continued to reject these amendments even after courts have specifically held that Title VII does not protect transsexuals from discrimination. *Compare* H.R. 1454, 97th Cong., 2d Sess. (1982) (hearing held on Jan. 27, 1982) *with Sommers v. Budget Marketing, Inc.*, 667 F.2d 748, 750 (8th Cir. Jan. 8, 1982) (per curiam); *Holloway v. Arthur Andersen & Co.*, 566 F.2d 659, 662–63 (9th Cir.1977); *Powell v. Read's, Inc.*, 436 F.Supp. 369, 371 (D.Md.1977); *Grossman v. Board of Education*, 11 Fair Empl. Prac. Cas. (BNA) 1196, 1199 (D.N.J.1975), *aff'd mem.*, 538 F.2d 319 (3d Cir.), *cert. denied*, 429 U.S. 897, 97 S.Ct. 261, 50 L.Ed.2d 181 (1976); *Voyles v. Ralph K. Davies Medical Center*, 403 F.Supp. 456, 457 (N.D.Cal.1975), *aff'd mem.*, 570 F.2d 354 (9th Cir.1978); *see also United States v. PATCO*, 653 F.2d 1134, 1138 (7th Cir. 1981) (Congress is presumed to know the law and judicial interpretations of it); *United States v. Ambrose*, 740 F.2d 505 at 514 (7th Cir.1984) (Wood, J., concurring and dissenting) (same).

■ Although the maxim that remedial statutes should be liberally construed is well recognized, that concept has reasonable bounds beyond which a court cannot go without transgressing the prerogatives of Congress. In our view, to include transsexuals within the reach of Title VII far exceeds mere statutory interpretation. Congress had a narrow view of sex in mind when it passed the Civil Rights Act, and it has rejected subsequent attempts to broaden the scope of its original interpretation. For us to now hold that Title VII protects transsexuals would take us out of the realm of interpreting and reviewing and

into the realm of legislating. *See Gunnison v. Commissioner*, 461 F.2d 496, 499 (7th Cir.1972) (it is for the legislature, not the courts, to expand the class of people protected by a statute). This we must not and will not do.

Congress has a right to deliberate on whether it wants such a broad sweeping of the untraditional and unusual within the term "sex" as used in Title VII. Only Congress can consider all the ramifications to society of such a broad view. We do not believe that the interpretation of the word "sex" as used in the statute is a mere matter of expert medical testimony or the credibility of witnesses produced in court. Congress may, at some future time, have some interest in testimony of that type, but it does not control our interpretation of Title VII based on the legislative history or lack thereof. If Congress believes that transsexuals should enjoy the protection of Title VII, it may so provide. Until that time, however, we decline in behalf of the Congress to judicially expand the definition of sex as used in Title VII beyond its common and traditional interpretation.

Our view of the application of Title VII to this type of case is not an original one. *Sommers v. Budget Marketing, Inc.*, 667 F.2d 748, 750 (8th Cir.1982) (per curiam), and *Holloway v. Arthur Andersen & Co.*, 566 F.2d 659, 662–63 (9th Cir.1977), the only two circuit court cases we found that have specifically addressed the issue, both held that discrimination against transsexuals does not fall within the ambit of Title VII.[12] In *Sommers*, Budget Marketing fired an anatomical male who claimed to be female once Budget Marketing discovered that he had misrepresented himself as female when he applied for the job. In *Holloway*, Arthur Andersen, an accounting firm, dismissed the plaintiff after he informed his superior that he was undergoing treatment in preparation for sex

12. For examples of district courts that have refused transsexuals Title VII protection, see *Terry v. EEOC*, 25 Empl.Prac.Dec. (CCH) ¶ 31,638, at 19,732–33 (E.D.Wis.1980); *Powell v. Read's, Inc.*, 436 F.Supp. 369, 371 (D.Md.1977); *Grossman v. Board of Education*, 11 Fair Empl.Prac.Cas. (BNA) 1196, 1199 (D.N.J.1975), *aff'd mem.*, 538 F.2d 319 (3d Cir.), *cert. denied*, 429 U.S. 897, 97 S.Ct. 261, 50 L.Ed.2d 181 (1976); *Voyles v. Ralph K. Davies, Medical Center*, 403 F.Supp. 456, 457 (N.D.Cal.1975), *aff'd mem.*, 570 F.2d 354 (9th Cir.1978).

change surgery. We agree with the Eighth and Ninth Circuits that if the term "sex" as it is used in Title VII is to mean more than biological male or biological female, the new definition must come from Congress.

**B.** *Title VII and Ulane as a Female.*

 The trial judge originally found only that Eastern had discriminated against Ulane under Count II as a transsexual. The judge subsequently amended his findings to hold that Ulane is also female and has been discriminated against on this basis. Even if we accept the district judge's holding that Ulane is female, he made no factual findings necessary to support his conclusion that Eastern discriminated against her on this basis. All the district judge said was that his previous "findings and conclusions concerning sexual discrimination against the plaintiff by Eastern Airlines, Inc. apply with equal force whether plaintiff be regarded as a transsexual or a female." This is insufficient to support a finding that Ulane was discriminated against because she is *female* since the district judge's previous findings all centered around his conclusion that Eastern did not want "[a] *transsexual* in the cockpit" (emphasis added).

Ulane is entitled to any personal belief about her sexual identity she desires. After the surgery, hormones, appearance changes, and a new Illinois birth certificate and FAA pilot's certificate, it may be that society, as the trial judge found, considers Ulane to be female. But even if one believes that a woman can be so easily created from what remains of a man, that does not decide this case. If Eastern had considered Ulane to be female and had discriminated against her because she was female (*i.e.*, Eastern treated females less favorably than males), then the argument might be made that Title VII applied, *cf.* *Holloway v. Arthur Andersen*, 566 F.2d at 664 (although Title VII does not prohibit discrimination against transsexuals, "trans-

sexuals claiming discrimination because of their sex, male or female, would clearly state a cause of action under Title VII") (dicta), but that is not this case. It is clear from the evidence that if Eastern did discriminate against Ulane, it was not because she is female, but because Ulane is a transsexual [13]—a biological male who takes female hormones, cross-dresses, and has surgically altered parts of her body to make it appear to be female.

Since Ulane was not discriminated against as a female, and since Title VII is not so expansive in scope as to prohibit discrimination against transsexuals, we reverse the order of the trial court and remand for entry of judgment in favor of Eastern on Count I and dismissal of Count II.

REVERSED.

---

13. Because of our holding in section A, however, we need not and do not decide whether Eastern did actually discriminate against Ulane because of her transsexuality.