Monica A. VALADEZ, Plaintiff,

v.

UNCLE JULIO'S OF ILLINOIS, INC., d/b/a Uncle Julio's Hacienda, Defendant.

No. 94 C 5860.

United States District Court, N.D. Illinois, Eastern Division.

Aug. 9, 1995.

Howard P. Kamin, Randall B. Gold, Lawrence, Kamin, Saunders & Uhlenhop, Chicago, IL, for plaintiff.

Ellen E. McLaughlin, Cynthia C. Mooney, Jeffrey Charles Kauffman, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

GETTLEMAN, District Judge.

Plaintiff Monica A. Valadez filed the instant complaint against defendant Uncle Julio's of Illinois, Inc. d/b/a Uncle Julio's Hacienda ("Uncle Julio's"), alleging that while working for defendant plaintiff was subjected to a pattern and practice of sexual harassment and sexual discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2(a) [1] and 2000e–3(a) [2]. De-

---

1. Section 2000e–2(a)(1) provides in part:

   It shall be an unlawful employment practice for an employer
   (1) to ... discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin;

2. Section 2000e–3(a) provides in part:

fendant moves for summary judgment pursuant to Fed.R.Civ.P. 56(c), asserting that the alleged harassment is not protected under Title VII. For the reasons set forth below, the court denies defendant's motion.

### Facts [3]

In 1991, plaintiff became a server at Uncle Julio's of Texas restaurant in Dallas, Texas. In September 1993, plaintiff transferred to defendant's restaurant in Chicago and became a bartender. Plaintiff remained in that position until her termination on January 25, 1994.

Plaintiff generally worked at Uncle Julio's six days a week. During the relevant period alleged in the complaint defendant employed the following management personnel: Julie Siron ("Siron") was the General Manager; John Moomau ("Moomau") was the Assistant General Manager and supervised the bartenders; Todd Conger ("Conger") was the Kitchen Manager; David Gordon ("Gordon") was the Floor Manager; and DeeAnn Leman ("Leman") was an Assistant Manager. Conger's brother, Jeff Conger ("Jeff"), was a bartender during the relevant period.[4]

Throughout her employment plaintiff alleges that Conger: (1) constantly referred to her vaginal area as her "hot wet little snatch"; (2) told plaintiff about his sexual fantasies involving other waitresses at the restaurant; (3) told plaintiff that he masturbated while reading a magazine; (4) told plaintiff that he "saw some hot women and was [masturbating]";[5] (5) often told plaintiff that he wanted to sleep with or "tag team" both plaintiff and Waitress A[6]; (6) told plaintiff in vulgar terms that he thought the reason that she got her tongue pierced was so that she could have better oral sex; (7) on a few occasions told plaintiff how he envisioned her pierced tongue would feel on his penis; (8) often told plaintiff how he would "like to [have oral sex with] plaintiff and other waitresses at the Restaurant until his face looked like a glazed donut"; (9) on at least 15 separate occasions told plaintiff that Waitress B "had a hot [vaginal area]" and that he wanted "to f__ her"; (10) referred to his erect penis as a "woodie" or "woodrow" and when Conger saw Waitress B he told plaintiff that "he was getting a woodrow"; (11) once when plaintiff bent over Conger said, "I wouldn't do that if I were you, you might get something you might not like"; and, (12) often commented to plaintiff about various customers who came to Uncle Julio's, saying "I bet she has a hot [vaginal area]" or "look at those knockers on her." Plaintiff also alleges that on one occasion Gordon referred to his penis as a "wonder penis" and told plaintiff that he was "well hung."

In addition to the above statements, Conger often asked plaintiff to have sex with him, stating he would "change [plaintiff's] ways" if she slept with him. Plaintiff further alleges that on one occasion Conger rubbed his groin against plaintiff. Plaintiff heard Conger make similar comments to Waitress A and heard Gordon tell another waitress that she had "really big tits." Conger's actions were witnessed by plaintiff's fellow employees [7] and a customer. In response to these comments plaintiff told Conger that she did not want to hear his sexual comments, to stop making sexual comments to

It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter ...

3. The facts are based on the undisputed facts set forth in the parties' Local Rule 12(M) and 12(N) statements.

4. To respect non-party witnesses' privacy, waitresses that testified for the parties or are named in the parties' briefs who are not relevant to the allegations in the complaint will be referred to as Waitress A, Waitress B, and Waitress C.

5. Certain terms that Conger allegedly used are so vulgar that the court will replace the words with parallel terminology. These words will be placed in brackets.

6. During plaintiff's employment she had an intimate sexual relationship with Waitress A. Although fellow employees knew that plaintiff was a lesbian, plaintiff asserts that she never spoke to anyone at the restaurant about her sexual experiences with women.

7. In an affidavit, Waitress C stated that she witnessed Conger make various sexual comments to plaintiff and Waitress A, including that Conger wanted to be included in sexual relations with plaintiff and Waitress A at the same time.

her, and that she thought he was disgusting. Plaintiff alleges that Conger just laughed in reply.

During plaintiff's employment defendant had employee food policies. Under these policies employees could eat only certain menu items and the food must be ordered through a manager. Plaintiff was aware of these policies and knew that if she wanted to eat a meal at work she had to get a manager to order the food for her, and she was not able to order an item called tacos el carbon ("Tacos").

On Saturday evening, January 22, 1994, plaintiff and Jeff were tending bar, Leman was working as a "swing bartender," and Moomau was managing. At 10:00 p.m. Leman asked Moomau to check the liquor room before Leman left for the evening. Defendant's liquor room is normally locked and the managers and bartenders have keys. Moomau and Leman went into the liquor room together and discovered a plate of Tacos on a shelf (the "January 22 Incident").

Moomau asked Leman about the Tacos and Leman denied that the Tacos were hers. Moomau then questioned all of the other bartenders that were on duty that evening. Plaintiff denied having anything to do with the Tacos. Jeff confessed that he had ordered the Tacos. Moomau did not take any remedial actions that night.

The following Monday, January 24, Moomau met with Siron to discuss the January 22 Incident. Prior to this meeting, Conger told Siron that his brother Jeff had taken the blame for plaintiff who in fact ordered the Tacos. During Moomau and Siron's January 24 meeting, Moomau told Siron that Jeff confessed that he had ordered the Tacos. Siron told Moomau what Conger said and that Leman had also told Siron that the Tacos had been for plaintiff.

Siron and Moomau then met with Jeff, who told them that he had ordered a plate of food earlier that day from the cook, Marcellino, which was not the plate found in the liquor room. Marcellino admitted that Jeff had ordered and came to get the Tacos. Moomau and Siron met and decided what remedial measures to take. On Monday, January 24, 1994, Moomau met with plaintiff and fired her. Moomau told plaintiff that she was being fired because of the Tacos and for allegedly lying about her involvement. Moomau filled out a termination report that states that plaintiff was discharged because of a "violation of company rules." The "comments section" of plaintiff's termination report states:

> Monica was determined to have violated company policy regarding the consumption of food during the shift. It was determined that she was in possession of food for her consumption in an unauthorized part of restaurant for such activity. She was also determined to be in possession of food which is not allowable for her consumption.

Moomau and Siron decided to demote Jeff rather than terminate him. Subsequently, on March 1, 1994, Jeff was terminated. Conger filled out Jeff's termination report that states the reason for Jeff's termination was "violation of Company Rules"; nothing was written in the comments section.

### Discussion

■ Under Fed.R.Civ.P. 56(c), a court should grant a summary judgement motion if "there is no genuine issue of material fact and ... the moving party is entitled to judgment as a matter of law." The burden is on the moving party to identify portions of the pleadings, answers to interrogatories, and affidavits which demonstrate an absence of a genuine issue of material fact. *Id.; Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c).

■ The opposing party must set forth specific facts, through affidavits or other materials, that demonstrate disputed material facts. *Liberty Lobby, Inc.,* 477 U.S. at 256, 106 S.Ct. at 2514. When reviewing a summary judgement motion, the court must read the facts in a light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). The court's role "is

not to evaluate the weight of the evidence or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact." *Doe v. R.R. Donnelley & Sons Company*, 42 F.3d 439, 443 (7th Cir.1994).

Defendant moves for summary judgment arguing: (1) Conger's alleged actions are not prohibited under Title VII; (2) plaintiff's hostile environment claim fails because it cannot rest on a single incident; (3) plaintiff's hostile environment claim fails because defendant did not have notice of the alleged hostile environment;[8] (4) plaintiff fails to establish a *prima facie* case of *quid pro quo* sexual harassment; and (5) even if plaintiff establishes a *prima facie* case of *quid pro quo* sexual harassment, plaintiff fails her burden of showing that defendant's articulated reason for her termination is pretext for unlawful discrimination.

**Hostile Environment Sexual Harassment**

Sexual harassment laws are designed to "protect working women from the kind of male attentions that can make the workplace hellish for women." *Baskerville v. Culligan*, 50 F.3d 428, 430 (7th Cir.1995), citing *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405–06, 91 L.Ed.2d 49 (1986). In *Baskerville*, the court noted the purpose for Title VII's sexual harassment protection and defined what it considers "sexual harassment":

> It is not designed to purge the workplace of vulgarity. Drawing the line is not always easy. On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers. (Internal citations omitted.)

In *Meritor*, the Supreme Court held that Title VII protects a worker against an employer who perpetrates or permits unwel-

come sexual advances that create an offensive or hostile working environment. 477 U.S. at 64, 106 S.Ct. at 2404. For the sexually related conduct or harassment to be actionable, "it must be sufficiently severe or pervasive as to alter the conditions of the victim's employment and to create an abusive working atmosphere." *Donnelley*, 42 F.3d at 443, citing *Meritor*, 477 U.S. at 67, 106 S.Ct. at 2405–06.

To determine whether an environment is "hostile" the court must look at all the surrounding circumstances including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, — U.S. —, —, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993). Other relevant factors include whether the alleged harasser invited the plaintiff either explicitly or by implication to have sex or go out on a date with him or made comments to the plaintiff that could not be repeated on "primetime television." See, *Baskerville*, 50 F.3d at 431. Further, the court can consider evidence of sexual harassment directed at other employees of the same sex as plaintiff. *Hall v. Gus Construction Co.*, 842 F.2d 1010, 1015 (8th Cir.1988).

Citing *Ulane v. Eastern Airlines, Inc.*, 742 F.2d 1081 (7th Cir.1984), *cert denied*, 471 U.S. 1017, 105 S.Ct. 2023, 85 L.Ed.2d 304 (1985), and analogous cases defendant argues that Conger's harassment was "directed" at plaintiff's sexual orientation and is therefore not proscribed under Title VII. In *Ulane*, the court held that homosexuals do not enjoy Title VII coverage for discrimination based on their sexual orientation. The court noted, however, that a homosexual who is discriminated against because of his or her sex can state a cause of action under Title VII. *Id.*, at 1087, citing, *Holloway v. Arthur Andersen, and Co.*, 566 F.2d 659, 664 (9th Cir.1977) ("although Title VII does not prohibit discrimination against transsexuals, transsexuals claiming discrimination because of their

---

**8.** While this argument was raised for the first time in defendant's reply brief it will be dis-

cussed below.

sex, male or female, would clearly state a cause of action under Title VII").

■ Defendant argues that because Conger was aroused by the fact that plaintiff is a lesbian his subsequent conduct is not actionable. Whether plaintiff would have enjoyed having sex with Conger is not the issue. The "critical issue" is whether plaintiff as a female was exposed to "disadvantageous terms or conditions of employment" to which defendant's male employees were not exposed. *Harris*, — U.S. at —, 114 S.Ct. at 372 (Justice Scalia, concurring opinion); *Barnes v. Costle*, 561 F.2d 983, 990 n. 55 (D.C.Cir. 1977) (legal question to ask in sex harassment cases is whether a condition was imposed "which, but for his or her sex, the employee would not have faced").

■ In the instant case, it is uncontested for purposes of defendant's motion for summary judgment that on many occasions Conger crudely discussed his desire to engage in sexual activities with plaintiff and other female employees, both lesbian and non-lesbian. Conger's sexual comments and advances were made to plaintiff in the first instance because she was a woman as well as a lesbian. There is no evidence that Conger made similar comments to hetero- or homosexual men or asked any of defendant's male employees to have sex with him. Other waitresses, both heterosexual and homosexual, testified that Conger made vulgar comments of a sexual nature to them.[9] There is uncontested evidence that plaintiff repeatedly told Conger to stop making these comments and that he disgusted her. Plaintiff testified that Conger's repeated comments and conduct made her embarrassed, uncomfortable, upset and anxious, and made it harder for plaintiff to perform her job.

The court finds that the holdings in *Ulane* and other sexual orientation cases are inapplicable to the facts in this case. Further, based on plaintiff's uncontested testimony and the corroborating testimony of Waitress A and Waitress C, the court finds that Conger's conduct towards plaintiff was gender based and as such, constitutes actionable sexual harassment.

■ Defendant next argues that because defendant believes that Conger's acts are not actionable, plaintiff's allegation that Gordon only sexually harassed her on one occasion is insufficient grounds to maintain a hostile work environment claim. "To maintain a claim of a hostile work environment, [plaintiff] must allege conduct that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment." *Koelsch v. Beltone Electronics Corp.*, 46 F.3d 705, 708 (7th Cir.1995).

It is uncontroverted that on nearly every shift plaintiff worked Conger referred to her vaginal area as her "hot wet little snatch," and that other employees and customers overheard these comments.[10] Further, Conger often asked plaintiff to go to bed with him, and often told plaintiff how he would "like to [have oral sex with] plaintiff and other waitresses at the Restaurant until his face looked like a glazed donut." The court finds that even in today's media, with its "life-like" language, these comments could not be repeated on prime time television. Even a "contemporary woman" in tune with "American popular culture in all its sex-saturated vulgarity" would find these comments offensive. *Baskerville*, 50 F.3d at 431.

Having found that Conger's alleged conduct is actionable, the court finds that Conger's alleged "uninvited sexual solicitations" and "obscene language" constitute sexual harassment and that the ongoing nature of the incidents involving Conger along with the incident involving Gordon are sufficient to state a claim for a hostile work environment. Accordingly, the court denies defendant's motion for summary judgment on plaintiff's hostile environment claim.

---

**9.** Waitress C, a heterosexual, testified that Conger made vulgar comments of a sexual nature to her at Uncle Julio's. Waitress C also testified that she told Conger that she did not want him to make these comments in her presence. Waitress A testified that Conger made a variety of sexual comments about female employees, including comments about their genitalia, breasts, buttocks, and various sexual acts.

**10.** A regular customer at Uncle Julio's stated that he overheard Conger make sexual comments to plaintiff, including Conger's reference to plaintiff's vagina using vulgar terminology.

Originating in its reply brief, defendant argues that plaintiff fails to establish that defendant had the requisite notice to be held liable for Conger and Gordon's conduct. Although the court must deny this argument because defendant failed to raise it in its original brief, the court will address the relevant standards and evidence in the record to assist the parties with respect to this issue. See, *Edwards v. Honeywell, Inc.*, 960 F.2d 673, 674 (7th Cir.1992) (a court is precluded from granting summary judgment on a ground that was first raised by the movant in its reply brief), citing, *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1310 (7th Cir.1989) ("[w]hen a party moves for summary judgment on ground A, his opponent is not required to respond to ground B—a ground the movant might have presented but did not").

■■■■■ Although employers are not absolutely liable for workplace sexual harassment, "absence of notice to an employer does not necessarily insulate that employer from liability." *Meritor*, 477 U.S. at 72, 106 S.Ct. at 2408. Defendant is liable for Conger's and Gordon's alleged conduct if: (1) defendant "knew, or should have known" of Conger and Gordon's conduct and "failed to take appropriate remedial action;" or, (2) Conger or Gordon were management-level employees who had the authority to hire and fire employees. *R.R. Donnelley*, 42 F.3d at 446 (because an employer is generally not responsible for the conduct of every low-level employee, the employer is liable only if he knew or should have known about the alleged conduct of a co-worker); *Hunter v. Allis–Chalmers Corp., Engine Division*, 797 F.2d 1417, 1422 (7th Cir.1986) ("[s]ince the acts of a corporation are acts of human beings, to say that the "corporation" has committed some wrong ... simply means that someone at the decision-making level in the corporate hierarchy has committed the wrong; the deliberate act of such a person is the corporation's deliberate act"); *Volk v. Coler*, 845 F.2d 1422, 1436 (7th Cir.1988) (employers are "strictly liable for sexual harassment by supervisory personnel who have the power to hire, fire or promote").

■■■■■ Defendant argues that plaintiff never complained to "management" about Conger's actions, and that Siron was never aware of any sexual harassment complaints from plaintiff or any other employee during plaintiff's employment. Plaintiff asserts that Conger's conduct was "well known" throughout Uncle Julio's. It is uncontested that plaintiff was never told whether defendant had sexual harassment policies, nor was plaintiff informed of any grievance procedures or policies for reporting employee complaints. At some point when sexual harassment is open and repetitive an employer is presumed to have been aware of a hostile work environment. See, *R.R. Donnelley*, 42 F.3d at 447 ("it is possible for sexual harassment to reach a level at which it can be presumed that the supervisor must have been aware that a hostile working environment existed").

■■■■■ Waitress A and Waitress C testified that Conger made the same type of sexually related comments to them and that they had seen Conger making the same type of sexual comments to others. One of defendant's regular customers witnessed Conger making vulgar comments to plaintiff. These facts alone raise a genuine issue as to whether the conduct was sufficiently open and notorious that defendant would be presumed to have notice of the alleged conduct. Further, Waitress C testified that while she never made a formal complaint, she thinks that she told one of the floor managers about Conger's comments and was told "yeah, that's Todd," or "well," or "just deal [with it]."

Defendant argues that Siron was unaware of Conger's actions. Even if Siron, defendant's General Manager, was unaware of Conger's conduct, defendant is liable for Conger's actions if any "management-level" employees knew or should have known of Conger's conduct and failed to take appropriate remedial action. *R.R. Donnelley*, 42 F.3d at 446. Further, while Siron stated that she was not aware of any official sexual harassment complaints, it is not clear whether Siron was aware of Conger's behavior or whether other managers were aware of Conger's behavior. Viewing the evidence in a light most favorable to plaintiff, the court finds that there is a genuine issue of fact whether any of defendant's "management-

level" employees knew of Conger's conduct, and whether defendant took any remedial action to discontinue the alleged harassment.

There is also insufficient evidence in the record to indicate whether Conger is a management-level employee.[11] If Conger is considered "management level," defendant is directly liable for his actions regardless of any notice to other managers. In her deposition, Waitress C testified that Conger had the power to hire and fire waitstaff and barstaff at the restaurant. Even in light of this testimony, it is unclear whether Conger had the actual authority to hire and fire plaintiff.

Accordingly, in addition to the fact that this issue was not properly raised, the court denies defendant's motion for summary judgment on the question of lack of notice of the alleged harassing behavior because there are genuine issues of fact whether defendant had sufficient notice and whether Conger was a management level employee.

### *Quid Pro Quo* **Sexual Harassment**

■ Defendant argues that plaintiff has failed to establish a *prima facie* case of *quid pro quo* sexual harassment because Conger never threatened to terminate plaintiff if she did not have sex with him, nor is there evidence that Conger or Gordon linked any economic benefits to her participation in sexual conduct. Equal Employment Opportunity Commission regulation 29 C.F.R. § 1604.11(a) provides:

Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, [or] (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual ...

Relying in part on this regulation, other courts have held that a plaintiff is not required to show an actual understanding that job benefits are linked to the plaintiff's submission to sexual advances. The plaintiff must show, however, that "the employer has in fact used the employee's reaction to the harassment as the basis for a decision concerning a tangible aspect of the plaintiff employee's terms, conditions or privileges of employment." *Huitt v. Market Street Hotel Corp.*, 1993 WL 245744 *3, 62 FEP (BNA) 538, 541 (D.Kan.1993), citing *Henson v. City of Dundee*, 682 F.2d 897, 909 (11th Cir.1982).

Analogous to the instant case, in *Huitt*, the plaintiff was not fired by her alleged harasser. The court held that the plaintiff need not establish that the harasser actually carried out the adverse employment action, only that the alleged harasser influenced the party that made the decision. *Id.*, *4 ("a causal nexus may still be inferred if the harasser participates in making the decision to take such action"). The court finds the analysis in *Huitt* persuasive.

■ Noting the holding in *Huitt*, defendant argues that plaintiff fails to establish a causal nexus between Conger's alleged harassment and defendant's decision to terminate plaintiff. Defendant relies on Siron and Moomau's affidavits that the two of them met alone, discussed the evidence surrounding the January 22 Incident, and made the decision to terminate plaintiff and demote Jeff. The court notes that defendant fails to address the evidence Siron and Moomau relied upon in determining whether plaintiff was guilty of the January 22 Incident. In her affidavit, Siron states that prior to discussing the January 22 Incident with Moomau, Conger had told Siron that his brother Jeff had "taken the blame" for plaintiff, and that it was plaintiff who had in fact ordered the Tacos. Siron and Moomau met with Jeff and questioned him again about the January 22 Incident after having been told by Conger and Leman[12] that plaintiff, not Jeff, had ordered the Tacos. It was during this dis-

---

**11.** Conger's title was "Kitchen Manager."

**12.** Siron states that Leman also told her that the Tacos had been for plaintiff. It is unclear why Moomau and Siron did not question Leman's accusation in light of the fact that she did not tell Moomau that she thought that plaintiff had ordered the Tacos when Moomau and Leman originally discovered the plate and Moomau asked Leman about the Tacos.

cussion that Jeff told Siron and Moomau a new version of the January 22 Incident, different from the one he originally told Moomau on January 22.

Based on this evidence, giving plaintiff the benefit of all reasonable inferences, the court finds that there is a genuine issue of fact whether Conger's statement to Siron accusing plaintiff of the January 22 Incident influenced Siron and Moomau's decision to fire plaintiff. The court finds that plaintiff has established enough evidence of a causal connection between Conger's accusations against plaintiff and her ultimate termination to raise a genuine issue of fact whether plaintiff sufficiently states a *quid pro quo* sexual harassment claim.

■ Even if plaintiff states a *quid pro quo* sexual harassment claim, defendant argues that plaintiff's claim fails as a matter of law because plaintiff fails to produce sufficient evidence that defendant's stated legitimate, non-discriminatory reason for plaintiff's termination is pretextual. Once plaintiff establishes a *prima facie* case of sexual harassment, the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for the challenged employment decision. *St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993).

■ After defendant articulates a legitimate, nondiscriminatory reason for having fired plaintiff, the burden then shifts back to plaintiff to establish that defendant's articulated reason is pretextual for unlawful discrimination. If plaintiff produces evidence that the decision to terminate her was influenced by her reaction to Conger's alleged harassment and that defendant's proffered reason is false, then the court may infer the ultimate fact of intentional discrimination. *Hicks,* —— U.S. at ——, 113 S.Ct. at 2749, ("[t]he factfinder's disbelief of the reasons put forward by the defendant ... may, together with the elements of the prima facie case, suffice to show intentional discrimination").

■ To meet her burden under Rule 56 plaintiff "must produce specific facts that cast doubt upon [defendant's] stated reasons for its action or raise significant issues of credibility." *Rand v. CF Industries, Inc.,* 42 F.3d 1139, 1146 (7th Cir.1994). Plaintiff asserts that: (1) she did not order or eat the Tacos found during the January 22 Incident; (2) Jeff, having admitted ordering and eating food that day, was originally only demoted and was not fired until March 1, 1994, over a month after plaintiff filed her discrimination charge with the Equal Employment Opportunity Commission ("EEOC") on January 26, 1994; and, (3) there is evidence that other employees who ordered and ate food in violation of defendant's rules were not fired, and there is no evidence that anyone was fired for having violated defendant's food rules prior to plaintiff's termination.

■ In addition to plaintiff's own denial that she did not order or eat the Tacos Marcellino, the cook involved in the January 22 Incident, stated that Jeff had ordered and received the Tacos and never alleged that plaintiff was involved. Waitress C testified that she had never heard of any of defendant's employees being fired for violating defendant's employee food rules prior to plaintiff's termination. Further, there is no evidence in the record that any employee was fired for having violated the rules at issue prior to plaintiff's termination.

In response to plaintiff's arguments defendant asserts that the only relevant issue is defendant's good faith belief that plaintiff was guilty of the January 22 Incident. Defendant argues that based on Conger's, Leman's, and Jeff's statements, Siron and Moomau could have reasonably believed that plaintiff had taken the food and lied to Moomau. It is not this court's job to weigh Moomau's and Siron's credibility. The court must determine whether plaintiff has offered sufficient facts and evidence to cast doubt on defendant's proffered reason for her termination.

The court finds that plaintiff's corroborated evidence that past employees had broken

the same rules and the lack of evidence that any employee was previously fired for that infraction, along with the evidence that Jeff was not fired until after plaintiff filed her EEOC discrimination claim,[13] taken in a light most favorable to plaintiff, casts sufficient doubt on defendant's proffered reason to deny defendant's motion for summary judgment on plaintiff's *quid pro quo* sexual harassment claim at this time. *Rand,* 42 F.3d at 1146–1147 ("where an employee presents testimony purporting to show that an employer's stated reasons for its action are unworthy of credence, '[t]he district court must still make a judgment as to whether the evidence, interpreted favorably to the plaintiff, could persuade a reasonable jury that the employer had discriminated against the plaintiff' ").

### Conclusion

For the reasons stated above, the court finds that plaintiff states a cause of action both for hostile environment and *quid pro quo* sexual harassment. Further, the court finds that plaintiff has produced enough evidence to raise genuine issues of fact barring defendant's motion for summary judgment as a matter of law. Accordingly, the court denies defendant's motion.

---

13. Defendant asserts that Jeff was treated differently from plaintiff because he admitted his involvement in the January 22 Incident, and Siron and Moomau believed that plaintiff had lied about her involvement. While plaintiff testified that Moomau told her that she was being fired for having lied, plaintiff's termination report states only that plaintiff was fired for possessing and consuming the Tacos during her shift. Jeff was admittedly guilty of these exact infractions.