Elizabeth R. MILLER, Plaintiff,

v.

VESTA, INC., Defendant.

No. 94–C–1270.

United States District Court, E.D. Wisconsin.

Nov. 22, 1996.

Mara Pehkonen–Theno, Theno Law Office, Cudahy, WI, for Plaintiff.

Scott C. Beightol, John J. Kalter, Michael, Best & Friedrich, Milwaukee, WI, for Defendant.

## DECISION AND ORDER

STADTMUELLER, Chief Judge.

### I. OVERVIEW

Plaintiff Elizabeth R. Miller, a former employee of defendant Vesta, Inc. ("Vesta"), filed this action pursuant to Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, on November 14, 1994. She filed an amended complaint on June 19, 1995. The case was assigned to United States Magistrate Judge Aaron E. Goodstein. On August 25, 1995, Magistrate Goodstein ordered, pursuant to the parties' stipulation, that Miller's first and second causes of action in the amended complaint be consolidated as a single cause of action for hostile environment sexual harassment. He also ordered that Miller's third and fourth causes of action remain unaltered. Thus, Miller claims that Vesta discriminated against her on the basis of her sex through both a hostile environment and disparate treatment, and that Vesta discharged her in retaliation for her complaints about sexual harassment by another employee, Lana Schuelke. Miller seeks reinstatement, back pay, and actual, punitive and compensatory damages.

Jurisdiction is proper under 28 U.S.C. § 1331. Venue is proper in this district. Vesta moved to dismiss the action for failure to state a claim, Fed.R.Civ.P. 12(b)(6) and for summary judgment, Fed.R.Civ.P. 56(b). On September 4, 1996, Magistrate Goodstein recommended that Vesta's motion to dismiss be denied, that its motion for summary judgment be granted, and that Miller's complaint and this action be dismissed. The case was assigned to this court for consideration of the recommendation. Miller timely filed objections to the magistrate's recommendation.

## II. SCOPE OF REVIEW

■ Magistrate Goodstein had limited jurisdiction, because the parties did not consent to magistrate jurisdiction. 28 U.S.C. § 636(b)(1)(B). Where a party objects to a magistrate's findings, the district court judge must make *de novo* determinations as to these findings. 28 U.S.C. § 636(b)(1)(C); *U.S. v. Raddatz,* 447 U.S. 667, 673–76, 100 S.Ct. 2406, 2411–13, 65 L.Ed.2d 424 (1980); *Delgado v. Bowen,* 782 F.2d 79, 82 (7th Cir. 1986); *Ramirez v. Turner,* 991 F.2d 351, 354 (7th Cir.1993). The court may review other portions of the recommendation if appropriate. *Delgado,* 782 F.2d at 82 (7th Cir.1986); Local Rule 13.02(b). "Although, in absence of such objections, the Court need not make

any review, 'the better practice' is to afford 'some level of review' to dispositive issues, even where a de novo determination is not required." *Zimbauer v. Milwaukee Orthopaedic Group, Ltd.,* 920 F.Supp. 959, 963 (E.D.Wis.1996) (Warren, J.) (quoting *Henderson v. Carlson,* 812 F.2d 874, 878 (3d Cir.), *cert. denied,* 484 U.S. 837, 108 S.Ct. 120, 98 L.Ed.2d 79 (1987)). The district court may adopt the recommendation in part or in whole and has final authority of judgment in the case. *Delgado,* 782 F.2d at 82.

## III. MOTION TO DISMISS

### A. Legal Standard

The court may dismiss a complaint pursuant to a Rule 12(b)(6) motion "only if 'it is clear beyond doubt that the non-movant can plead no facts that would support his claim for relief.'" *Palda v. General Dynamics Corp.,* 47 F.3d 872, 874 (7th Cir.1995) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)). In considering dismissal, the court must "accept as true all the plaintiff's well pleaded factual allegations and the inferences reasonably drawn from them." *Gibson v. City of Chicago,* 910 F.2d 1510, 1520–21 (7th Cir.1990); *see also Travel All Over the World, Inc. v. Kingdom of Saudi Arabia,* 73 F.3d 1423, 1428 (7th Cir.1996).

### B. Hostile Environment Claim

■ Although the parties have not objected to the magistrate's recommendation that the motion to dismiss Miller's hostile environment claim be denied, the motion presents an issue of law unresolved by the Seventh Circuit. For this reason, the court will review de novo the magistrate's conclusion that sexual harassment by a person of the same sex as the plaintiff is actionable under Title VII.

The court holds that Title VII prohibits sexual harassment, in the form of a hostile environment, by a person of the same sex as the victim of the harassment. In so deciding, this court agrees with both the magistrate's recommendation and with Judge Warren's conclusion in *Johnson v. Hondo, Inc.,* 940 F.Supp. 1403, 1409 (E.D.Wis.1996) (Warren, J.). These decisions comport with the lan-

guage of the statute and with the majority of federal court decisions addressing the issue.

■ Title VII of the Civil Rights Act of 1964 prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The Supreme Court has held that Title VII prohibits sexual harassment as a form of sex discrimination. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986). There are two cognizable forms of sexual harassment under Title VII: (1) quid pro quo harassment, in which a superior requires sexual relations with an employee in return for job benefits; and (2) hostile or abusive work environments. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 20, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993); *Meritor*, 477 U.S. at 64, 106 S.Ct. at 2404. Under Title VII, a hostile or abusive work environment is one in which "discriminatory conduct [is] so severe or pervasive that it create[s] a work environment abusive to employees because of their race, gender, religion, or national origin...." *Harris*, 510 U.S. at 22, 114 S.Ct. at 371. Miller has made a claim of hostile environment sexual harassment.

The court bases its conclusion that Title VII encompasses claims of same-sex hostile environment sexual harassment upon first, the language of the statute and the Supreme Court's interpretations of it; second, the Equal Employment Opportunity Commission ("EEOC")'s interpretation of the statute; third, the weight of persuasive authority on the issue; and fourth, the lack of definitive Congressional intent, as revealed in contrary authority.

First, Title VII's plain language is broad and does not limit its prohibition on sex discrimination to discrimination of one sex by the other. The first step in statutory construction is reading "the language of the statute." *Bailey v. U.S.*, —— U.S. ——, ——, 116 S.Ct. 501, 506, 133 L.Ed.2d 472 (1995). "Where the statutory language is clear, our sole function is to enforce it according to its terms." *Rake v. Wade*, 508 U.S. 464, 471, 113 S.Ct. 2187, 2191, 124 L.Ed.2d 424 (1993)

(internal quotations and citation omitted). "When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning." *Smith v. U.S.*, 508 U.S. 223, 228, 113 S.Ct. 2050, 2053, 124 L.Ed.2d 138 (1993); *accord, Ulane v. Eastern Airlines, Inc.*, 742 F.2d 1081, 1085 (7th Cir.1984), *cert. denied*, 471 U.S. 1017, 105 S.Ct. 2023, 85 L.Ed.2d 304 (1985).

The Supreme Court has indicated that Title VII uses "sex" in the sense of "gender." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 239–41, 109 S.Ct. 1775, 1784–86, 104 L.Ed.2d 268 (1989) (using the terms "gender" and "sex" interchangeably); *Harris*, 510 U.S. at 22, 114 S.Ct. at 371 (Title VII violation occurs when "discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their ... gender). The language of Title VII simply bars discrimination based on an employee's sex and does not speak to the harasser's gender. It is not the courts' role to limit the protections Congress conferred by selecting broad and general language. "Had Congress intended to insulate sexual harassers from liability as long as those sexual harassers selected their victims carefully, not only should Congress have spoken more clearly, it could have at least said something." *Williams v. District of Columbia*, 916 F.Supp. 1, 9 (D.D.C.1996).

The case law further indicates that Title VII is blind to the gender of the harasser. The statute bars hostile environment sexual harassment "based on sex." *Meritor*, 477 U.S. at 66, 106 S.Ct. at 2405. The relevant sex and perspective are that of the victim: "Without question, when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." *Id.* at 64, 106 S.Ct. at 2404. "The gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.'" *Id.* at 68, 106 S.Ct. at 2406. This language implies no requirement that the harasser be of the opposite sex from the victim. Instead, the perspective is that of the victim, and the offensive conduct is based on the sex of the victim.

To the degree there is ambiguity in Title VII, the court finds some of the EEOC's reasoning persuasive. The Supreme Court has stated that the EEOC Guidelines on sexual harassment are an "administrative interpretation of the Act by the enforcing agency" that, "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor*, 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (internal citations and quotations omitted).

The EEOC has determined that it is irrelevant whether the harasser and victim are of the same or different genders.

> The victim does not have to be of the opposite sex from the harasser. Since sexual harassment is a form of sex discrimination, the crucial inquiry is whether the harasser treats a member or members of one sex differently from members of the other sex. The victim and the harasser may be of the same sex where, for instance, the sexual harassment is based on the victim's sex (not on the victim's sexual preference) and the harasser does not treat the employees of the opposite sex the same way.

EEOC Compliance Manual, CCH, § 615.2(b)(3). Although as discussed below, the court believes the EEOC has unjustifiably required unequal treatment of the sexes for an actionable Title VII claim, it accepts the EEOC's conclusion that same-sex sexual harassment is actionable under Title VII.

The weight of well-reasoned authority suggests that hostile environment same-sex harassment is actionable under Title VII. *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1378–79 (8th Cir.1996); *Johnson*, 940 F.Supp. at 1409; *Vandeventer v. Wabash Nat. Corp.*, 887 F.Supp. 1178, 1181 (N.D.Ind. 1995); *Griffith v. Keystone Steel and Wire, Div. of Keystone Consol. Industries, Inc.*, 887 F.Supp. 1133, 1136–37 (C.D.Ill.1995); *Gerd v. United Parcel Service, Inc.*, 934 F.Supp. 357, 359 (D.Colo.1996); *Waag v. Thomas Pontiac, Buick, GMC, Inc.*, 930 F.Supp. 393, 399 (D.Minn.1996); *Tietgen v. Brown's Westminster Motors, Inc.*, 921 F.Supp. 1495, 1500–01 (E.D.Va.1996) (holding that same-sex harass-

ment by bisexuals or homosexuals is actionable under Title VII); *Tanner v. Prima Donna Resorts, Inc.*, 919 F.Supp. 351, 354 (D.Nev.1996); *Ladd v. Sertoma Handicapped Opportunity Program, Inc.*, 917 F.Supp. 766, 767 (N.D.Okla.1995); *Williams*, 916 F.Supp. at 10; *King v. M.R. Brown, Inc.*, 911 F.Supp. 161, 168 (E.D.Pa.1995); *Raney v. District of Columbia*, 892 F.Supp. 283, 288 (D.D.C.1995); *E.E.O.C. v. Walden Book Co., Inc.*, 885 F.Supp. 1100, 1104 (M.D.Tenn. 1995); *McCoy v. Johnson Controls World Services, Inc.*, 878 F.Supp. 229 (S.D.Ga.1995) *Sardinia v. Dellwood Foods, Inc.*, 1995 WL 640502, at *4–5 (S.D.N.Y.1995); *Roe v. K-Mart Corp.*, 1995 WL 316783, *1 (D.S.C. 1995).

In addition, Seventh Circuit dicta allows this conclusion. Chief Judge Posner, writing in *Baskerville v. Culligan Intern. Co.*, 50 F.3d 428 (7th Cir.1995), stated that "[s]exual harassment of women by men is the most common kind, but we do not mean to exclude the possibility that sexual harassment of men by women, or men by other men, or women by other women would not also be actionable in appropriate cases." *Id.* at 430. At the least, *Baskerville* does not foreclose this court's holding; at the most, it suggests this court's holding is correct.

Other courts have found same-sex sexual harassment either not actionable, *Oncale v. Sundowner Offshore Services, Inc.*, 83 F.3d 118, 120 (5th Cir.1996) (citing *Garcia v. Elf Atochem North America*, 28 F.3d 446, 451–52 (5th Cir.1994)); *Goluszek v. H.P. Smith*, 697 F.Supp. 1452, 1456 (N.D.Ill.1988); *Torres v. National Precision Blanking*, 943 F.Supp. 952, 957 (N.D.Ill.1996) ("a male cannot, as a matter of law, sue for sexual harassment by a fellow male under Title VII, no matter the sexual orientations of the two"); *Ashworth v. Roundup Co.*, 897 F.Supp. 489, 494 (W.D.Wash.1995); *Benekritis v. Johnson*, 882 F.Supp. 521, 525–26 (D.S.C.1995); *Fleenor v. Hewitt Soap Co.*, 1995 WL 386793, *2–*3 (S.D.Ohio 1995); or actionable only where the harasser is homosexual or bisexual. *McWilliams v. Fairfax County Bd. of Supervisors*, 72 F.3d 1191, 1195–96 (4th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 72, 136 L.Ed.2d 32 (1996); *Hopkins v. Baltimore*

*Gas and Elec. Co.,* 77 F.3d 745, 753 (4th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 70, 136 L.Ed.2d 30 (1996); *Martin v. Norfolk Southern Ry. Co.,* 926 F.Supp. 1044, 1049 (N.D.Ala.1996) ("in the case of same-sex heterosexual hostile working environment sexual harassment, the presumption of sexual gratification and thus, sex discrimination, ceases to exist").

In considering the opinions of courts that have found same sex harassment claims are not cognizable under Title VII, the court rejects them for their reliance upon *Goluszek.* In *Goluszek,* the court granted summary judgment to the defendant on plaintiff's claim of sexual harassment. 697 F.Supp. at 1456. Male co-workers subjected the plaintiff, a man in a male-dominated environment, to seven years of repeated incidents of harassment. The court stated: "Title VII does not make all forms of harassment actionable, nor does it even make all forms of verbal harassment with sexual overtones actionable." *Id.* The plaintiff had no claim because, as a male in a male-dominated environment, he could not show an environment that was biased against males. *Id.*

Reliance on *Goluszek* is misplaced. First, it is wrong to resort to the legislative history, because the natural reading of the statute is that it prohibits employment discrimination based on the plaintiff's sex, and Supreme Court case law supports this conclusion. Second, as numerous courts have pointed out, the *Goluszek* court built its understanding of Congressional intent upon a foundation of quicksand. *Williams,* 916 F.Supp. at 8–9; *Tanner,* 919 F.Supp. at 354; *King,* 911 F.Supp. at 167. Its basis for determining that Title VII did not allow claims for this type of same-sex harassment was that "[t]he discrimination Congress was concerned about when it enacted Title VII is one stemming from an imbalance of power and an abuse of that imbalance by the powerful which results in discrimination against a discrete and vulnerable group." *Id.* For this proposition, the court cited a note, "Sexual Harassment Claims of Abusive Work Environment Under Title VII." 97 Harv.L.Rev. 1449, 1451–52 (1984). Although this part of the note admirably examines conceptual frameworks of sexual harassment, it does not explore Congress's intent in passing Title VII. Thus, the *Goluszek* court had no basis for its gloss on Title VII's legislative history. Not only is it inappropriate to delve into Congressional intent when the statute's language is clear, *Goluszek* is simply not persuasive or reliable authority for interpreting Title VII's provisions on sex discrimination. In general, its progeny are similarly flawed.

In any case, the Supreme Court has rejected *Goluszek*'s understanding that Congress acted narrowly in passing Title VII. In discussing Title VII, the Supreme Court noted that "we are left with little legislative history to guide us in interpreting the Act's prohibition against discrimination based on 'sex.' " *Meritor,* 477 U.S. at 64, 106 S.Ct. at 2404. The term "sex" was added to Title VII a day or two before the House passed the law. *Id.* at 63, 106 S.Ct. at 2403; *Waag,* 930 F.Supp. at 400; *Ulane,* 742 F.2d at 1085. The amendment was added by an opponent of the Civil Rights Act. *Id.* Congressman Smith proposed the amendment addition to "prevent discrimination against ... women." *Waag,* 930 F.Supp. at 400 (citing 110 Cong. Rec. at 2577). Congresswoman May, arguing in favor of the addition of "sex," said "it is only just and fair to give all women protection against discrimination." *Id.* (citing 110 Cong.Rec. at 2582). May said that the bill was "an endeavor to have all persons, men and women, possess the same rights and opportunities." *Id.* (citing 110 Cong.Rec. at 2583). The House passed Title VII without hearing or debate. *Ulane,* 742 F.2d at 1085.

Although Title VII has a dearth of legislative history, the Supreme Court has interpreted the term "sex" expansively. One court has noted that "the legislative history indicates that Congress may have added the word "sex" to Title VII with the goal of protecting women from unfair employment practices." *Waag,* 930 F.Supp. 393, 400. Even if this history might have been understood to protect only women employees, the Supreme Court has interpreted the Civil Rights Act to protect both men and women employees. *Newport News Shipbuilding and Dry Dock Co. v. E.E.O.C.,* 462 U.S. 669, 682, 103 S.Ct. 2622, 2630, 77 L.Ed.2d 89

(1983) (holding that an employer's insurance plan violated Title VII by discriminating against employees' husbands); *Meritor*, 477 U.S. at 64, 106 S.Ct. at 2404 (Title VII "evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women.'"). The Supreme Court has therefore broadly interpreted Title VII's protections against sex-based discrimination.

As indicated above, the court is able to interpret the statute by its plain language and with Supreme Court case law and need not turn to the legislative history. However, it is important to point out that nothing in the legislative history specifically addresses whether Congress did or did not intend to prohibit same sex discriminatory conduct. Thus, courts that limit Title VII's protections, contrary to the statute's broad language and case law, must guess at Congressional intent. As an example, one judge stated, "it is apparent that Congress did not intend such sweeping regulation [to allow same-sex claims]. The suggestion that Title VII was intended to regulate everything sexual in the workplace would have undoubtedly shocked every member of the 88th Congress...." *Hopkins*, 77 F.3d at 751. The legislative history supporting this comment is not cited. However, this court is convinced that the members of the 88th Congress would find it far more shocking that some federal courts today interpret Title VII as condoning on-the-job homosexual and other same sex harassment while prohibiting heterosexual harassment.

With this decision, the court rejects the theory that Title VII turns on the harasser's desired sexual gratification as a necessary element of a Title VII violation. This is reflected in the Fourth Circuit's presumption that while opposite-sex harassment is based on sex due to sexual desires, same-sex harassment is not based upon sex. *Hopkins*, 77 F.3d at 753; *see also Martin*, 926 F.Supp. at 1049. The statute simply prohibits discrimination based on the sex of the target. It does not speak to the motivation of the harasser outside the sex of the victim. Moreover, the Supreme Court has specified the focus should be on whether the sexual behavior was unwelcomed by the victim.

There is no call for courts to create presumptions or categories not contemplated by the statute or the Supreme Court. To do otherwise might unnecessarily restrict Title VII's protections. For example, where a person of one gender discriminates against employees of the other gender due to dislike of the gender, there may be no element of sexual desire, yet there is discrimination that is actionable under Title VII's broad language. For these reasons, this court rejects any presumption that shifts the focus toward the harasser's motivations, other than the victim's sex, and away from the effect on the victim. Regardless of the harasser's gender or sexual orientation, Title VII protects all employees from all sexual harassment on account of their sex.

The court rejects a line of case law, including *Goluszek*, that requires a workplace biased against the plaintiff's gender. *Goluszek*'s actual holding was that plaintiff's claim failed because he could not show an anti-male environment. 697 F.Supp. at 1456. Likewise, the court must reject the EEOC's position that "the crucial inquiry is whether the harasser treats a member or members of one sex differently from members of the other sex." EEOC Compliance Manual, CCH, §·615.2(b)(3). Similar to the EEOC's position, several circuit courts have found that one element of sexual harassment is that an employer treated employees of different sexes unequally. They believe this follows from the proposition that sexual harassment is based on the employee's sex. Those courts admit their logic leads to the conclusion that there is no sexual harassment where the employer harasses employees of both genders equally. *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir.1982); *Bundy v. Jackson*, 641 F.2d 934, 942 n. 7 (D.C.Cir. 1981) ("the question is one of but-for causation: would the complaining employee have suffered the harassment had he or she been of a different gender? ... Only by a reductio ad absurdum could we imagine a case of harassment that is not sex discrimination where a bisexual supervisor harasses men and women alike").

These cases are no longer persuasive after *Meritor*, with its focus on the victim. Simi-

larly, the Seventh Circuit, concluding that a sexual harassment claim arises from verbal harassment of male and female employees equally, has rejected the requirement of unequal harassment of males and females. *McDonnell v. Cisneros*, 84 F.3d 256, 260 (7th Cir.1996). The key aspect of sexual harassment is that the sexual behavior was unwelcome. *See Carr v. Allison Gas Turbine Div., General Motors Corp.*, 32 F.3d 1007, 1008 (7th Cir.1994) (" 'Welcome sexual harassment' is an oxymoron.") (Posner, C.J.). Thus:

> there really are only two questions in a case such as this. The first is whether the *plaintiff* was, *because of her sex,* subjected to such hostile, intimidating, or degrading behavior, verbal or nonverbal, as to affect adversely the conditions under which she worked.... The second question is whether, if so, the defendant's response or lack thereof to its employees' behavior was negligent.

*Id.* at 1009 (emphasis added).

Title VII protects individuals, not classes. *See Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 158 (7th Cir.1996) (citing *O'Connor v. Consolidated Coin Caterers Corp.*, — U.S. —, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996)). The Seventh Circuit rejected, as uncompelling and "too literal," the argument that there is no actionable sexual harassment where "the harassment was impartially directed against [a] male and [a] female...." *McDonnell v. Cisneros*, 84 F.3d 256, 260 (7th Cir.1996). Along these lines, *Carson* rejected a mechanical formulation for a prima facie case of alleged race-based employment termination. The court stated (in dicta) that "[t]he question instead is whether the plaintiff has established a logical reason to believe that the decision rests on a legally forbidden ground." 82 F.3d at 159. Thus, a winning Title VII case requires only "[a]ny demonstration strong enough to support a judgment in the plaintiff's favor if the employer remains silent ..., even if the proof does not fit into a set of pigeonholes." *Id.*

In a Title VII sexual harassment case, the focus is on whether there is an allegation or evidence that the plaintiff, not those of her class, suffered sexual harassment based on her sex. Disparate treatment of the genders is evidence of such harassment, but it is not a requirement. Thus, an employer that sexually harasses both genders equally is not insulated from Title VII liability. Instead, it would be liable for all of the sexual harassment it perpetrates, because it is individuals, not classes, who suffer discrimination.

Finally, the holding in this part of the case is not in conflict with *Ulane v. Eastern Airlines, Inc.*, 742 F.2d 1081 (7th Cir.1984). In *Ulane*, the Seventh Circuit held that Title VII's prohibition on sex discrimination did not bar discrimination against transsexuals. *Id.* at 1086. In dicta, the court recognized that "sex" did not include "sexual preference." *Id.* at 1084. In its analysis, the court stated that Congress's rejection of Civil Rights Act amendments conferring protection based upon "affectional or sexual orientation" meant that "the phrase in the Civil Rights Act prohibiting discrimination on the basis of sex should be given a narrow, traditional interpretation, which would also exclude transsexuals." *Id.* at 1085–86. Instead, the court held that "the term 'sex' as it is used in Title VII" means only "biological male or biological female." *Id.* at 1087. This court's holding today only confirms that plaintiffs have a cause of action if they suffered discrimination based upon their status as either a biological male or a biological female. The *Ulane* decision did not address the relevance of the harasser's relative gender, and this court's holding is consistent with it.

### C. Disparate Treatment Claim

The magistrate recommended denial of Vesta's motion to dismiss Miller's disparate treatment claim. Vesta contends that dismissal is appropriate because Miller failed to bring her claim before the EEOC. The magistrate correctly stated the law, applied it to the facts, and denied the motion.

### 1. Legal Standard

In general, a plaintiff may not bring Title VII claims that she did not first present to the EEOC. *Harper v. Godfrey Co.*, 45 F.3d 143, 147–48 (7th Cir.1995). Exhaustion of administrative remedies pro-

motes settlement and gives notice to employers. *Id.* at 148. Proper presentation of Title VII claims to the EEOC requires a description, with some degree of specificity, of the allegedly discriminatory conduct. *See Cheek v. Western and Southern Life Ins. Co.,* 31 F.3d 497, 502 (7th Cir.1994).

██ If the claim is not clear on the face of an EEOC charge, a plaintiff may still bring the claim in federal court if (1) the claims in the complaint are alike or reasonably related to the claims in the charge; and (2) the complaint's claims could be reasonably expected to develop from the EEOC's investigation of the charges. *See Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.,* 538 F.2d 164, 167 (7th Cir.) (en banc), *cert. denied,* 429 U.S. 986, 97 S.Ct. 506, 50 L.Ed.2d 598 (1976); *see also Cheek,* 31 F.3d at 500. The test for whether a given claim might grow out of an EEOC investigation is whether it is reasonable to infer that a given claim might result. *Id.* Claims are alike or reasonably related where they are factually related, which requires at a minimum that the charge and complaint "describe the *same conduct* and implicate the *same individuals.*" *Id.* at 501 (emphasis in original). A similar assertion of generic discrimination does not meet this minimum requirement. *Id.*

██ In determining whether claims are factually related, the court may look at allegations outside the body of the Charge of Discrimination where "it is clear that the charging party intended the agency to investigate the allegations." *Cheek,* 31 F.3d at 502. It is proper to consider statements in sworn affidavits filed in support of the charge. *Id.* Even where the defendant did not receive the affidavit, the affidavit may be considered in defining the charge's scope. As the magistrate stated, the Seventh Circuit has indicated that, as long as a supporting document is intended to spur an EEOC investigation of its claim, the EEOC's investigation gives the employer sufficient notice of the claim. *Id.* at 505.

## 2. Facts

In her August 17, 1993 "Charge of Discrimination," Miller stated:

I. Since February 10, 1993, until I was discharged on August 4, 1993, I was sexually harassed by a female co-worker. After I complained about the harassment I was discharged.

II. Linda Christensen, Production Manager, told me I was discharged for excessive absenteeism.

III. I believe I was sexually harassed because of my sex (female), and was discharged in retaliation for complaining about the sexual harassment in violation of Title VII of the Civil Rights Act of 1964, as amended.

Charge of Discrimination at 1. In her affidavit filed with the EEOC in support of her claim, Miller stated: "I was never given any written or oral warnings regarding my absenteeism. I believe that the males were given warnings regarding their absenteeism." Complaint, Miller's EEOC Affidavit at 3. She also stated that her nephew and brother-in-law, who were also employed by Vesta and were frequently absent from work, were not disciplined or terminated but were placed on probation. *Id.*

## 3. Analysis

██ Miller's EEOC charge contains sexual harassment and retaliatory discharge claims, but there is no suggestion of disparate treatment. However, her affidavit describes the same conduct by the same individuals that she alleges in her federal complaint. Specifically, she claims she was treated differently from men who were frequently absent but who were placed on probation rather than terminated. Furthermore, an EEOC investigation of the allegations in the supporting affidavit could reasonably be expected to lead to a disparate treatment claim. Although Vesta said Miller was discharged for absenteeism, Miller alleged the real reason was preferential treatment for men and gave examples. Thus, it is clear both that Miller expected an EEOC investigation of her allegations and that a properly-focused investigation should have uncovered any such sex discrimination. For these reasons, the court concludes Miller adequately presented her disparate treatment claim to

the EEOC, and Vesta's motion to dismiss must be denied.

## IV. MOTION FOR SUMMARY JUDGMENT

The magistrate recommended granting Vesta's motion for summary judgment as to all claims. He concluded that Miller was not subjected to a hostile environment, that she had no prima facie case of retaliatory discharge or disparate treatment, and that Vesta provided unrebutted non-discriminatory reasons for Miller's discharge. After considering Miller's objections, the court agrees with the magistrate and will grant summary judgment for Vesta.

### A. Summary Judgment Standard

A court must grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Where a rational trier of fact, viewing the whole record and drawing all reasonable inferences in the non-moving party's favor, could not find for the non-moving party, the court must grant summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Courtney v. Biosound, Inc.*, 42 F.3d 414, 418 (7th Cir. 1994). Facts are material if they might affect the outcome of the case under applicable law, and a dispute over material facts is "genuine" only if a reasonable jury could resolve it for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The party moving for summary judgment has the initial burden of showing that there are no disputed material facts and that it is entitled to judgment in its favor. *Hannon v. Turnage*, 892 F.2d 653, 656 (7th Cir.), *cert. denied*, 498 U.S. 821, 111 S.Ct. 69, 112 L.Ed.2d 43 (1990). A defendant may satisfy this initial burden by pointing to a plaintiff's failure to introduce sufficient evidence to support each essential element of the cause of action alleged. *See Anderson*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Once the movant carries its initial burden, the burden shifts to the non-moving party, who must "go beyond the pleadings" and designate specific facts to support each element of its cause of action, showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Becker v. Tenenbaum–Hill Associates, Inc.*, 914 F.2d 107, 110 (7th Cir.1990).

### B. Magistrate's Factual Findings and Objections

The magistrate found the following undisputed facts:

1. The plaintiff, Elizabeth Miller, was an employee of Vesta from August 31, 1992 until August 4, 1993.

2. On or about February 12, 1993, a female co-employee, Lana Schuelke, left two notes in the plaintiff's locker, the implication of which to Miller was that Schuelke desired to commence a lesbian/sexual relationship with Miller.

3. After she received the notes, Miller spoke with Mary Burgey, the leadperson of Miller's shift, and told her about the notes. Burgey asked if Miller wanted her to talk to management; Miller said yes and Burgey made copies of the notes. Burgey gave the notes to Linda Christensen, production manager of Vesta, and asked Christensen to deal with the matter.

4. On or about February 19, 1993, Miller met with Christensen regarding the letters. Miller told Christensen that the notes "humiliated" her and that it bothered her that Schuelke placed the notes in her locker.

5. Christensen then met with Schuelke, showed her the notes, and told Schuelke that Miller was uncomfortable about the notes. Schuelke admitted that she had sent the notes, Christensen told Schuelke not to send any more notes and Schuelke promised not to send any more notes.

6. Christensen then told Miller of her meeting with Schuelke. Thereafter, Christensen asked Burgey to keep an eye on

both Miller and Schuelke and report any incidents between the two women.

7. There is no allegation by Miller that Schuelke ever touched her.

8. In early 1993, Cindy Bartelt, Vesta's backup payroll clerk, posted a copy of a poster which described sexual harassment, explained that it was unlawful, and explained that an employee could make a sexual harassment complaint with Vesta's management or with the Wisconsin Department of Industry, Labor and Human Relations.

9. On or about April 23, 1993, Schuelke placed a birthday card for Miller in Miller's locker. Miller informed Burgey that Schuelke sent her a birthday card, but neither Burgey nor Miller mentioned the card to Christensen. There is a difference between the parties as to whether or not Miller was upset by this card.

10. In another incident, Miller believed that Schuelke was following her into the restroom at Vesta. Miller told Heinrich Knoch, the second shift supervisor, and Knoch told Miller that she should use another restroom at Vesta if she was concerned. The other restroom was a single restroom which could be locked from the inside.

11. Miller also alleges that Schuelke continually stared at her while on the job from early February, 1993 until Miller was dismissed in August, 1993. According to the defendant, Miller never told a Vesta supervisor about the staring, but Miller says she did complain about this to Burgey.

12. On or about July 27, 1993, Miller was assigned to work next to Schuelke. Miller told Burgey that she was uncomfortable about working next to Schuelke, but Burgey responded that those were the only available jobs. July 27, 1993 was the only night Miller was assigned to work next to Schuelke.

13. The defendant contends that in the spring of 1993, Knoch warned Miller about her absentee rate. Knoch recalls that he received a note from Christensen indicating that Knoch should warn Miller about her absentee rate. Miller denies that Knoch ever spoke to her about this.

14. From approximately July 30, 1993 until August 3, 1993, Miller was granted a three-day leave to attend her grandmother's funeral in Columbus, Wisconsin. On August 4, 1993, Miller informed Vesta that she was sick and would not be able to work that day.

15. On August 4, 1993, Christensen informed Miller that she was terminated for excessive absenteeism.

16. According to the defendant's records, Miller was absent 17.9 percent of the work days from January 1, 1993 through August 4, 1993. During the third quarter of 1993, Miller was absent 37.5 percent of the work days. Miller disputes the defendant's records and states that, based upon her pay stubs, the absentee rate was lower.

17. Ken Abbot, a male employee who the plaintiff alleges received different treatment than she did, was absent 6.6 percent of the work days from January 1, 1993 until August 4, 1993, and 12.5 percent of the work days in the third quarter of 1993. Christensen gave Abbot an oral warning as well as probation for his absentee rate. Miller submits that the defendant has distorted Abbot's rate.

Magistrate's Recommendation at 15–18.

Miller specifically objects to six aspects of the magistrate's factual findings. The court has examined both Miller's response to Vesta's proposed findings of fact and the evidentiary materials Miller cites in her objections.

First, Miller objects to the magistrate's failure to find that Mary Burgey, after giving the letters placed in Miller's locker to Christensen, passed the letters around to other employees causing Miller humiliation and embarrassment. Miller's Objections to Magistrate's Recommendation ("Objections") ¶ 1. She cites the deposition of Ken Abbot at pp. 32–36, which are not included with the excerpts of the deposition of Kenneth E. Abbot and therefore are not part of the record before the court. As Miller has not properly supported her position, the court will not make the additional requested factual finding.

Second, Miller seeks a finding "that Miller had to demand that Christensen meet with her to address the issue of unwelcome letters placed in Miller's locker." Objections ¶ 2. At ¶ 5 of Miller's response to Vesta's proposed findings of fact ("FOF"), she says:

> Contrary to FOF at paragraph 21, Christensen called Miller to her office to discuss the notes only after Miller demanded that something be done about the letters placed in her locker and Miller believed too much time had passed since she had received the notes and she believed Christensen was ignoring the problem because nothing was being done about it (Miller Dep. pp. 77–81).

Vesta's reply does not address the substance of Miller's response, and Miller's evidentiary citation supports her proposed finding of fact. Thus, the court makes this finding of fact:

> 3A: After Miller spoke with Burgey on February 12, she did not hear from Christensen by February 19, when Miller went to Christensen's office and asked Christensen if she was going to handle the problems about the letters. Christensen then said that she would have a meeting and would call Miller back into her office. About fifteen to twenty minutes later, Christensen called Miller back for a meeting.

Third, Miller contends that there was more than one incident in which Miller believed Schuelke was following her into the women's restroom at Vesta. Objections, ¶ 3. Miller cites no evidence here. Moreover, she does not address this proposition in her Response to FOF. Accordingly, there is no properly cited factual predicate on which the magistrate or this court could make the requested factual finding.

Fourth, Miller seeks a factual finding that "Burgey was a management employee with authority to discipline employees as demonstrated in the testimony and documents provided in Miller's response." Objections, ¶ 4. Miller cites no evidence here, but in the Response to FOF ¶ 3, Miller contradicts Vesta's FOF ¶¶ 11–13. She cites numerous evidentiary materials, but most do not mention Burgey. The ones that do, Abbot's Dep. pp.

48–49, and Beightol Aff. Ex. A, do not indicate that Burgey had the responsibilities Miller ascribes to her. The court rejects this requested finding.

Fifth, Miller proposes as a factual finding that "Ken Abbott received numerous warnings per Abbot's own testimony and Vesta's document contained in Abbot's employee file." Objections ¶ 5. Miller cites no evidence here. However, Beightol Aff. Ex. A contains an employee warning notice to Ken Abbott, dated June 13, 1994, for attendance, lateness, unauthorized absence from work area and insubordination. Abbott received three days disciplinary layoff without pay. That notice also indicates Abbott received two previous warnings. Thus, the court modifies factual finding 17:

> 17. Ken Abbot, a male employee who the plaintiff alleges received different treatment than she did, was absent 6.6 percent of the work days from January 1, 1993 until August 4, 1993, and 12.5 percent of the work days in the third quarter of 1993. Abbot received several oral and written warnings, at least one of which was for attendance, lateness or early quitting, and unauthorized absence from work area. In addition, Christensen gave Abbot an oral warning as well as probation for his absentee rate. Miller submits that the defendant has distorted Abbot's absentee rate.

Sixth, Miller objects to the magistrate's adoption of Vesta's interpretation and calculation of her absences. Objections ¶ 6. The magistrate correctly pointed out that Miller's calculations were flawed and therefore relied upon Vesta's figures. Recommendation at 29. This is a determination of logic, not credibility, so it was well within the magistrate's power to make such a finding. In addition, Miller argues it was inappropriate for Vesta to include excused absences in her absentee rate, although she does not dispute that Vesta's actual calculations under that method were inaccurate. Response to FOF ¶ 27. Miller's calculations, which exclude "excused absences and company sanctioned time off," show she was absent 6.3 percent in 1993. *Id.* However, Miller failed to show that Vesta calculated other employees' absentee rates differently. For these reasons,

the magistrate made no error in adopting Vesta's figures as to Miller's absenteeism, though there remains a legal issue of whether Vesta may rely upon its method of calculation.

## C. Hostile Environment Sexual Harassment

Miller objects to the magistrate's conclusion that she failed to present an actionable claim of hostile environment sexual harassment. Miller says that the magistrate improperly ignored:

the repugnant homosexuality involved in this case. Miller viewed this environment as deeply repugnant and hostile, requiring her to seek relief from her physician. Miller is a married heterosexual female and should not have had to deal with repelling a lesbian relationship in or out of the workplace once she had said no.

Other reasonable people find homosexuality equally repugnant. The United States Military has a policy of "Don't Ask; Don't Tell". The Defense of Marriage Act passed by Congress provides that the federal government will not recognize same sex marriages. The bill recently in Congress barring discrimination against gays in the workplace ·failed. As quoted in the Milwaukee Journal of September 11, 1996, at page 14A, Majority Leader Sen. Trent Lott (R–Miss.) stated, "This bill would validate a lifestyle that is unacceptable." Even those professing to be tolerant and understanding of homosexuality are not likely to say, "Sure, I'll try it to see if I like it."

Objections at 3.

■■■ The existence of a hostile work environment is a mixed question of law and fact. *Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1269 (7th Cir.1991). Where sexual harassment is perpetrated by a fellow employee, not a superior, the employer is liable where the plaintiff can show two things: (1) she was actually subjected to a hostile environment; and (2) the employer's response, or lack thereof, to the environment was negligent. *Carr v. Allison Gas Turbine Div., General Motors Corp.*, 32 F.3d 1007, 1009 (7th Cir.1994). A hostile work environment requires harassment that is "sufficiently severe or pervasive as to alter the conditions of the victim's employment and to create ˙an abusive working atmosphere." *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir.1994). The existence of a hostile environment depends upon the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23, 114 S.Ct. at 371. The court must evaluate the circumstances from both subjective and objective viewpoints—the effect the conduct actually had on the plaintiff and the impact the conduct would likely have on a reasonable employee in similar circumstances. *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 534 (7th Cir.1993). Thus, an actionable hostile environment is one that a reasonable person would find hostile or abusive and that the victim perceives it as abusive. *Harris*, 510 U.S. at 20, 114 S.Ct. at 370. An employer must remedy discrimination by taking reasonable steps to discover and rectify the harassment. *Baskerville*, 50 F.3d at 432.

In the Recommendation, the magistrate concluded that Miller failed to state an actionable claim of hostile environment sexual harassment because under the circumstances, a reasonable person would not have found the environment at Vesta hostile or abusive. Recommendation at 20. The magistrate accepted for the sake of argument that "Miller subjectively perceived the environment at Vesta to be hostile and abusive." *Id.* The magistrate noted that the fact that one woman was directing conduct toward another woman did not alter the conclusion that there was no hostile or abusive environment. *Id.* at 21–22.

■■■ Based upon the factual findings and upon disputed factual issues resolved in Miller's favor, the court agrees that as a matter of law, Miller was not subjected to a hostile environment based on her sex. The court agrees with the magistrate's characterization of alleged harasser's actions. Because the harasser's actions were not so frequent or severe, apart from their homosexual

character, to create a hostile environment, the court addresses Miller's objections, which raise two closely related novel issues of law. The general issue is whether Miller may also rely upon the harassment's homosexual character to contend there was a hostile environment. The first, and easier question, is: does homosexual harassment always create a hostile environment as a matter of law? The court holds it does not. Title VII is aimed at all sexual harassment, which is by definition unwelcome. *Meritor,* 477 U.S. at 68, 106 S.Ct. at 2406. The statute and case law do not say that some types of sexual conduct are per se unwelcome in a hostile environment case. Instead, the case law requires a case-by-case approach in which the courts look at the totality of the circumstances and focus on the intensity, intimidation, frequency and interference. *Harris,* 510 U.S. at 22, 114 S.Ct. at 371.

■ Moreover, it is settled that Title VII's protection on account of "sex" does not offer protection on the basis of sexual orientation, but on the basis of gender. *Ulane v. Eastern Airlines, Inc.,* 742 F.2d 1081, 1084–86 (7th Cir.1984); *DeSantis v. Pacific Tel. & Tel. Co., Inc.,* 608 F.2d 327, 329–30 (9th Cir.1979); *Torres,* 943 F.Supp. at 957. For this reason, the statute does not confer absolute protection upon Miller as a married heterosexual allegedly harassed by a lesbian. To hold that homosexual harassment of heterosexuals automatically creates a hostile environment in violation of Title VII would grant protection based upon a plaintiff's sexual orientation. However, heterosexuality, as a sexual orientation, is simply not a protected characteristic under Title VII.

■ The second question is more difficult: is the fact that same-sex harassment is perpetrated by a homosexual a cognizable circumstance in determining whether there was a hostile employment environment? The court concludes it is not in this case, because to consider such a circumstance would impermissibly confer Title VII protections based partially upon Miller's status as a heterosexual. As Title VII does not protect employees based upon their sexual orientation, so it seems plaintiffs should not be able to rely on the relative sexual orientations of the harasser and victim to argue that there was a hostile environment. Considering sexual orientation in assessing whether there was a hostile environment would effectively introduce sexual orientation-based protections into Title VII.

Plaintiff's references to various Congressional action and inaction are of no avail here. The national policy mandating that members of the armed forces who are found to be homosexual be separated from the armed forces applies only to the military. 10 U.S.C. § 654(b). It relies upon findings specific to the military service and specifically points out how military service is different from civilian life. 10 U.S.C. § 654(a). The Defense of Marriage Act, Pub.L. No. 104–199, 110 Stat. 2419 (1996), creates a federal definition of marriage and frees states from recognizing marriages outside that definition. It in no way overrides the statutory language or case law of Title VII. Finally, the Senate's rejection of the Employment Non–Discrimination Act of 1996, S.2056, 104th Cong. (1996), which purported "to provide a comprehensive Federal prohibition of employment discrimination on the basis of sexual orientation" and "to provide meaningful and effective remedies for employment discrimination on the basis of sexual orientation," did not affect Title VII. *Id.* § 2. The vote indicates, if anything, that the Senate is still unwilling to protect employees from discrimination based upon sexual orientation, which was defined to include heterosexuality. Thus, Title VII appears to offer Miller no protection on the basis of sexual orientation.

On the other hand, courts must determine whether there was a hostile environment based upon the "totality of the circumstances." No court has specifically addressed whether the parties' relative sexual orientations are part of the totality. The fact that harassment is done by a person of the opposite sexual orientation could influence a plaintiff's reaction to the harassment. Miller allegedly considered the alleged harasser's homosexuality to be "deeply repugnant," and if true, this could subjectively affect her ability to do her job. While it is a harder question whether a reasonable person would react similarly, the court cannot rule out that the

homosexual aspect of harassment could objectively contribute a hostile environment.

Nevertheless, because Miller bases her reaction to the harasser's sexual orientation upon Miller's status as a "heterosexual female," her harasser's relative sexual orientation is not a cognizable circumstance in Miller's hostile environment claim. *Cf. Fox v. Sierra Development Co.,* 876 F.Supp. 1169, 1174–75 (D.Nev.1995) (holding that homosexual intent of alleged conduct by coemployees is irrelevant in determining whether an actionable hostile environment existed). It may be possible, on other facts, to separate a plaintiff's reaction to the sexual orientation of the harasser from the plaintiff's own sexual orientation. However, that is not the case here, and under Title VII, Miller cannot base her hostile environment claim even partially upon her sexual orientation.

■■■ As an alternative holding, Vesta is entitled to summary judgment even if Schuelke's gender and sexual orientation are factored in. As the magistrate correctly concluded, the allegedly harassing incidents were mild in character and rare in frequency. There was no physical contact between Schuelke and Miller, and there was no graphic sexual innuendo. Schuelke stared at Miller and followed her into the restroom. Even though both Schuelke and Miller are both women, these mild incidents do not objectively amount to sexual harassment as a matter of law.

Miller's evidence that work-related stress increased her blood pressure is insufficient in this context to establish a hostile environment. Miller relies on the testimony of Francis X. Ruzicka, M.D., who saw her for the first time on March 11, 1993 in connection with her high blood pressure complaint. Ruzicka Dep. at 56, 59–60. He saw her again on August 3, 1993. *Id.* at 64. Ruzicka indicated that Miller suffered from work-related stress that was a factor in her high blood pressure. *Id.* at 64, 109–110, 116, 120–121. Miller's stress at work stemmed from her lack of sleep, harassment by a female coworker and working on the second shift. *Id.* at 67, 71, 93–94. Ruzicka gave Miller a medical excuse for work for March 12, 1993 so that she could rest at home. *Id.* at 77–78.

Although Ruzicka's testimony could establish that Miller subjectively perceived a hostile environment, Miller still cannot satisfy the objective component of the hostile environment test. This is a situation where the hostile environment test's objective-subjective character is perhaps most useful. Miller has presented evidence that could satisfy the subjective component. However, the evidence is far from satisfying the objective component, and this suggests that ultimately the subjective component would not be satisfied. The magistrate correctly viewed the salient factor here as those of a junior high school crush. In this situation, Schuelke's infrequent, mild actions are highly unlikely by themselves to have caused Miller's reaction to her workplace. Although Schuelke's actions were inappropriate in an employment setting, they did not create a hostile environment for Miller. Title VII does not insulate employees from all sexual interplay, whether it be heterosexual or homosexual, and there is no reasonable expectation of total freedom from sexual incidents in the workplace. The events at Vesta did not create an environment that a reasonable person would perceive as hostile. As there was no hostile environment, it is unnecessary to address Miller's argument that Vesta did not take sufficient remedial action. Vesta is entitled to summary judgment on Miller's hostile environment claim.

### D. Retaliatory Discharge

The magistrate recommended that Vesta be granted summary judgment on Miller's retaliatory discharge claim. He concluded that Miller had not established a prima facie case, because she could not prove a causal link between her complaints of sexual harassment and her termination. The magistrate reasoned further that even if Miller had a prima facie case, Vesta put forth a legitimate nondiscriminatory reason for terminating Miller, i.e., her excessive absenteeism, that Miller could not show was pretextual. The court agrees with the magistrate's conclusion.

### 1. Legal Standard

Title VII makes it unlawful "for an employer to discriminate against any of his em-

ployees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e–3(a). Where, as here, a plaintiff has no direct evidence of retaliatory discharge, a plaintiff may use the burden-shifting methodology to prove retaliatory discharge. *Johnson v. University of Wisconsin–Eau Claire,* 70 F.3d 469, 479 (7th Cir.1995). The plaintiff must first make out a prima facie case that includes that 1) she engaged in statutorily protected expression; 2) that her employer took an adverse employment action against her; and 3) that the protected expression caused the adverse action. *Id.* The third element requires a showing that the protected expression was a but-for cause of the adverse action. *Id.* Once the plaintiff establishes a prima facie case, the defendant must articulate a legitimate non-discriminatory reason for the adverse action. *Id.* If the defendant can do so, the burden shifts back to the plaintiff, who must prove the defendant's reason is a pretext for an underlying discriminatory reason. *Id.*

### 2. Lack of a Causal Link in Prima Facie Case

 Miller has not demonstrated a prima facie case, because she has not raised a fact issue as to a causal link between her sexual harassment complaints and her discharge. "And the substantial time lapse between the events is counter-evidence of any causal connection." *Samuelson v. Durkee/French/Airwick,* 976 F.2d 1111, 1115 (7th Cir.1992) (noting that substantial time lapse "discounts" a causal connection between two events). Christensen terminated Miller on August 4, 1993. Miller complained of Schuelke's actions to Christensen in February 1993, and there is no evidence that Christensen knew of later complaints. Miller's complaints to Burgey are not a basis for a causal link, because there is no evidence or reasonable inference that Burgey played a role in the decision to terminate Miller or that Burgey told Christensen of post-February complaints. As the evidence shows Christensen knew only of the first complaint and over five months elapsed between the complaint and Miller's termination, it would be unreasonable to find a causal link between the two. In addition, there is no reasonable basis for finding that Miller's complaints gave Vesta a motive to terminate Miller. Miller did not threaten Vesta or file a complaint with an outside agency, seek discipline against Schuelke, or do anything that could have disturbed Vesta. There is no indication that conflict between Schuelke and Miller was disrupting the work environment.

Miller's citation to Christensen's testimony does not help her. Objections at 5. Christensen indicated that at her second meeting with Miller, "being followed and stared at ... added a little more light to it." Christensen Dep. at 69. From other portions of Christensen's testimony, it is clear that this second meeting took place on February 19. *Id.* at 74–78. Christensen testified that to her knowledge, Miller had no problems with Schuelke after February. *Id.* at 87–88. Thus, Miller has not shown that Christensen knew of further complaints by Miller after February 19. There is no rational link between Miller's complaints and her termination.

### 3. Lack of Pretext

 The magistrate was also correct that Miller failed to show Vesta's legitimate reason for terminating her, high absenteeism, was a pretext. High absenteeism is a legitimate reason for discharging an employee. *See Timms v. Frank,* 953 F.2d 281, 287 (7th Cir.), *cert. denied,* 504 U.S. 957, 112 S.Ct. 2307, 119 L.Ed.2d 228 (1992). As indicated above, there is no fact issue that Vesta correctly calculated Miller's absence rate. As discussed below, Vesta was entitled to include all days on which she was scheduled to work but was absent, for whatever reason. Under this standard, Miller cannot argue that this is a pretext for retaliatory discharge, because she has not pointed to non-complaining employees who were absent as frequently as she was. This is discussed further in the next section. Vesta has articulated an unrebutted non-discriminatory reason for terminating Miller, and the court will accept the magistrate's recommendation and grant summary judgment to Vesta on Miller's retaliatory discharge claim.

### E. Disparate Treatment Claim

The magistrate recommended that the court grant summary judgment to Vesta on Miller's disparate treatment sex discrimination claim, because Miller cannot prove a prima facie case and cannot show that Vesta's reason for terminating her was a pretext for discrimination. The court agrees and will grant summary judgment.

Where a plaintiff has no direct evidence of disparate treatment based on sex, she may use the burden shifting method to prove her case. *Samuelson v. Durkee/French/Airwick*, 976 F.2d 1111, 1113 (7th Cir.1992). A prima facie case of disparate treatment sex discrimination requires that plaintiff show: 1) she is a member of a protected class; (2) she performed her job duties to her employer's expectations; (3) she suffered an adverse employment action; and (4) employees outside her protected class were treated more favorably, or there is some other evidence she was treated unfavorably because of her class. *Id.; see Carson*, 82 F.3d at 159. Once a plaintiff makes out a prima facie case, the employer must provide a legitimate, non-discriminatory reason for the employment action. *Id.* at 1114. If it does, then the plaintiff must show the reason was pretextual. *Id.*

■ Miller has no prima facie case. First, she has not shown that she performed her duties to Vesta's satisfaction. Given the close relation between Miller's job performance and Vesta's reason for terminating Miller, the court shifts its focus as appropriate to Miller's pretext argument. *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 936 (7th Cir.1996). However, Miller has simply provided no evidence on this point, and her self-serving statements of adequate performance are not enough to defeat summary judgment. *Mills v. First Federal Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 843 (7th Cir.1996). Her argument that there were no complaints in her record is simply an absence of proof to the contrary. Objections at 6. She also says no one told her of problems with her performance. However, these do not show that Vesta perceived Miller performed adequately.

More to the point is that Miller's absence rate indicates she was not performing satisfactorily. Satisfactory attendance is a necessary component of adequate job performance. *Hughes v. Chesapeake and Potomac Telephone Co.*, 583 F.Supp. 66, 70 (D.D.C. 1983). Likewise, high absenteeism is a valid reason for terminating an employee. *See Timms*, 953 F.2d at 287. Miller's absence rate was 17.9% in 1993 and 37.5% for the third quarter of that year. The court rejects Miller's argument that it was inappropriate to include excused absences and company sanctioned time off in her absence rate. Courts are not to interfere with legitimate business judgments, and a worker who is absent is not a contributing employee regardless of why she may be absent. Miller's avowed absence rate of 6.3% is not, as she argues, excessive only to a workaholic. When unexcused and excused absences are combined, Vesta was entitled to view Miller's work record as unacceptable. Although the parties cite no law as to what constitutes an unacceptable absenteeism rate for this type of job, it is safe to rule that Miller's absences were too frequent to allow a finding of satisfactory job performance and frequent enough to allow her discharge.

■ Second, Miller has not shown she was treated unfavorably when compared to similarly situated males or because of her sex. To prove this element, a plaintiff must point to other employees, outside the protected class, who had similar work and attendance records but were not terminated. *Hughes*, 583 F.Supp. at 70; *see also Rush v. McDonald's Corp.*, 966 F.2d 1104, 1112 (7th Cir.1992). Moreover, such a comparison must "demonstrate more than occasional leniency toward other employees who had engaged in conduct of a similar nature." *Hiatt v. Rockwell Intern. Corp.*, 26 F.3d 761, 771 (7th Cir.1994). "More evidence than the mere fact that other employees were not discharged for at best arguably similar misconduct must be demonstrated to sustain a charge of intentional discrimination." *Id.*

The parties disagree as to what constitutes a similarly situated employee. Obviously, no two employees can be identical in every way except sex. However, in principle the court

accepts Vesta's definition: employees within their first year of employment who had accumulated a substantial number of absences in one year. Miller points to only Ken Abbot. It is not clear that Abbot was in his first year of employment. Moreover, Abbot had an absence rate of 6.6% for the year and 12.5% for the third quarter. Both of these absence rates are less than one-third of Miller's. Thus, Abbot was not in the same situation as Miller. The same holds true for Miller's contention that she received no warnings, whereas similarly-situated men did. Miller was absent so much more often than Abbot that Vesta did not need to follow the same disciplinary procedures for both employees. Even accepting that Miller and Abbot were similarly situated, a disparity of treatment between two employees would not ultimately be enough to sustain Miller's employment discrimination claim. Thus, Miller cannot show she suffered disparate treatment.

■ Alternatively, Vesta has offered a legitimate discriminatory reason for terminating Miller and for not warning her about her absences. Her absence race was extremely high, and an employer could legitimately terminate her without giving her a second chance. The evidence says Miller was gone from work far more than other employees, so it is wrong to compare Miller's summary termination with the treatment Vesta gave male employees who were more reliable workers. As Miller cannot show anyone who was absent as often as she, she cannot show her termination for excessive absenteeism was a pretext for sex discrimination. Accordingly,

IT IS ORDERED that defendant's motion to dismiss be and the same is hereby **DENIED;**

IT IS FURTHER ORDERED that defendant's motion for summary judgment be and the same is hereby **GRANTED;** and

IT IS FURTHER ORDERED that plaintiff's complaint and this action be and the same are hereby **DISMISSED** with prejudice.

The clerk is directed to enter judgment accordingly.